HENRY B. HOLBROOK and
HATTIE B. HOLBROOK,

*Plaintiffs and Appellants,*

vs.

CONTINENTAL OIL COMPANY, a Corporation,
BUCK CREEK OIL COMPANY, a Corporation,
CLARENCE A. BLACK, DAVID ARMSTRONG,
and CARL TICKNOR,

*Defendants and Respondents.*

(No. 2641; January 4th, 1955; 278 Pac. (2d) 798)

322

For the plaintiffs and appellants, the cause was submitted upon the brief and also oral argument of William G. Watt of Wheatland, Wyoming, and J. J. Hickey of Cheyenne, Wyoming.

For the defendants and respondents, the cause was submitted upon the brief and also oral argument of W. J. Wehrli of Casper, Wyoming, and Robert G. Hawley of Denver, Colorado.

## OPINION

RINER, Chief Justice

The controversy in this case involves a portion of the ranch holdings of the plaintiffs which total about 5,200 acres; specifically, the west half of Section 25 and the south half of the northeast quarter of Section 26, Township 36 North, Range 64 West of the sixth principal meridian, are the lands to be considered in the litigations before us. The portion of Section 25 above-

mentioned is located at the northwest corner of plaintiff's property and does not appear to be adjacent to any other land held by plaintiffs under lease or in fee. The defendant corporations will frequently be designated as the "oil companies" or by their respective names, as may be convenient, and for the purpose of clarity.

The record shows that a patent was issued from the United States Government to one Ralph E. Marshall on March 26, 1923, for the west half of Section 25 aforesaid; and that instrument contained a mineral reservation reading:

"Excepting and reserving, also, to the United States all the oil and gas in the lands so patented and to it or persons authorized by it, the right to prospect for, mine, and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the Act of July 17, 1914 (38 Stat., 509)."

The Act of July 17, 1914, so far as here pertinent (see Section 122 of Title 30, U.S.C.A.) provides that any patent covering lands withdrawn or classified as mineral should contain a reservation to the United States of the mineral deposits on account of which the lands thus patented were withdrawn or classified as valuable for mineral development and that "Any person who has acquired from the United States the title to or the right to mine and remove the reserved deposits," in the event the United States should dispose of such mineral deposits in the lands, "may reenter and occupy so much of the surface thereof as may be required for *all purposes reasonably incident* to the mining and removal of the minerals therefrom, and mine and remove such minerals, upon payment of damages caused thereby to the owner of the land, or upon giving a good and sufficient bond or undertaking therefor

in an action instituted in any competent court to ascertain and fix said damages." (Italics supplied.) The damages the statute intended to cover are previously mentioned in the statute as "damages to the crops and improvements on such lands," and the measure thereof was to be fixed by "agreement of parties or by a court of competent jurisdiction."

There appears also to have been issued by the United States on July 1, 1943, to Albert N. Rundquist and W. W. Wright "subject to any unit agreement heretofore or hereafter approved by the Secretary of the Interior" an oil and gas lease covering the west half of Section 25 aforesaid which, it is conceded, is now in force and effect and is owned by the defendant oil companies.

A United States patent was also issued by the Government to Ralph E. Marshall on March 26, 1923, covering the south half of the northeast quarter of Section 26, Township 36 North, Range 64 West of the sixth principal meridan. This patent contained a mineral reservation, to wit:

"Excepting and reserving, however, to the United States all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine and remove the same pursuant to the provisions and limitations of the Act of December 29, 1916 (39 Stat., 862)."

The provisions of the Act of Congress of December 29, 1916, material here are found in Chapter 9 thereof (see Section 299 of Title 43, U.S.C.A.) which provides that all patents issued shall "contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same." The statute also provides that:

"Any person who has acquired from the United States the coal or other mineral deposits in any such

land, or the right to mine and remove the same, may reenter and occupy so much of the surface thereof as may be required for *all purposes reasonably incident* to the mining or removal of the coal or other minerals . . . upon the execution of a good and sufficient bond or undertaking to the United States for the use and benefit of the entryman or owner of the land, to secure the payment of *such damages to the crops or tangible improvements* of the entryman or owner, as may be determined and fixed in an action brought upon the bond or undertaking in a court of competent jurisdiction against the principal and sureties thereon, such bond or undertaking to be in form and in accordance with rules and regulations prescribed by the Secretary of the Interior and to be filed with and approved by the register of the local land office of the district wherein the land is situate, subject to appeal to the Commissioner of the General Land Office . . . " (Italics supplied.)

Another oil and gas lease embracing the south half of the northeast quarter of Section 26 aforesaid and other lands was issued by the United States to Frank Cordell under date of July 10, 1939, it being conceded by the parties to this action that this lease is now owned and held by the defendant oil companies. Of the entire ranch holdings of the plaintiffs, the west half of Section 25 and the south half of the northeast quarter of Section 26 aforesaid, including 400 acres, are the only lands upon which the defendant oil companies are engaged in operating as oil and gas lessees. The individual defendants in this case are employees of the Continental Oil Company living in the dwellings subsequently mentioned and are without interest in these leases.

Plaintiffs purchased all of the deeded lands in their ranch except the 400 acres mentioned above as located in Section 25 and Section 26 aforesaid and on January 25, 1947, obtained a deed thereto from one Frank W. Chambers. From September, 1938, until the land was

bought from Chambers, the land was held by plaintiffs under lease from him. Only the surface of the land was involved in this lease.

The defendant oil companies entered upon the lands leased by them, as stated above, and drilled their first well in 1943. Nine wells have been drilled on the west half of Section 25, six of which are producing, the remaining wells being dry holes. When the plaintiffs purchased the lands in January, 1947, five wells had been completed. Six wells have been drilled on the south half of the northeast quarter of Section 26; half of these are producing, but the others are dry. Four of these wells were drilled prior to 1947 and two thereafter. Wells 1, 8, 3, 9, and 5 are about 330 feet from the west line of Section 25; wells 6, 4, and 7 are about 990 feet from that line. A tank battery was constructed located on the west line of the west half of Section 25 about 162 feet south of its northeast corner. This battery covers about one and a half acres and is used to separate oil from water; large quantities of the latter is mixed with the oil come from the wells. This water has to be separated from the oil before the oil can be transported away from the lease.

In June, 1953, the average daily production on the Wright lease on the west half of Section 25 was 257 barrels of oil and 1344 barrels of water. The same month on the Cordell "A" lease on the south half of the northeast quarter of Section 26, the average daily production was 92 barrels of oil and 962 barrels of water. During the same month, the oil production from the Cordell "B" lease, covering the north half of the north half of Section 26, which was processed through the tank battery was 2 barrels of oil and 231 barrels of water; the Cordell "B" lease embracing the north half of the north half of Section 26 aforesaid covers lands

included in the lease with the south half of the north-east quarter of Section 26.

Three dwelling houses were constructed by the oil companies on the west half of Section 25 aforesaid, along the north line of the west half of Section 25 and occupying one and a half acres. One of the houses was constructed in April, 1943, and the other two in February, 1949; only the employees of the defendant Continental Company live in these houses. These men have have always been employed upon the Wright or Cordell "A" leases, or both of them, or in connection with the operation of the tank battery already mentioned. There has to be three eight-hour shifts or tours for these employees on the tank battery because it is necessary to have men on the lease at all times to take care of emergencies, e.g., fires, production loss, and maintenance of producing equipment, especially during the winter months. From these leases to the town of Lusk, it is about forty-two miles, and about six or eight miles to the town of Lance Creek. These houses were erected because of the situation outlined above. This 400-acre tract was purchased by plaintiffs for $2,500 ($6.25 per acre).

Findings of Fact and Conclusions of Law favorable to the defendants and against the plaintiffs were made by the court. In the Findings of Fact is set forth that: ". . . each and all of the allegations set forth in the Defendants' Answer are true."

Also, it was found that:

". . . the said defendants have not done anything that is not reasonably incident to the production, removal, transportation and marketing of the oil from said lands, and that the said defendants in their operations have not done anything that should not be done, nor have they omitted to do anything that should be done. That the individual defendants are the employees of the defendant Continental Oil Company and said Con-

tinental Oil Company is the operator of the lands covered by said oil and gas leases hereinabove described, and the said Continental Oil Company was entitled to construct the three residences located upon the NE¼NW¼NW¼ of said Section 25, and to have the same occupied by its employees and families, and that said houses are built upon concrete foundations with excavated basements and plumbing attached and connected with a cesspool upon said land.

&ast; &ast; &ast;

"9. That the defendant oil companies have been entitled to construct and are entitled to maintain all roads located upon the lands owned by plaintiffs and all pipe lines, derricks, well sites, tank batteries, separation plant, houses and other installations heretofore and now located thereon.

"10. That the natural grass growing upon plaintiffs' lands is not compensable under the terms of the said oil and gas leases or the governing federal statutes and that there are no live streams of water polluted on said lands to the injury of the plaintiffs.

"11. That no testimony was either offered or received as to any damages to crops and improvements or either. sustained by plaintiffs as to the lands owned by them being the W½ of said Section 25, and the S½NE¼ of said Section 26, and there was no testimony that there was any damage to plaintiffs in any specific amount of money arising either from damages to crops on said lands or from damages to improvements thereon.

"12. That upon all other issues not covered by the foregoing findings, the court finds generally in favor of the defendants and against the plaintiffs."

Among the Conclusions of Law are found the following:

"2. That the Plaintiffs are the owners in fee simple of the lands in question subject to the dominant right of the defendants' oil and gas leases.

"3. That the residences located thereon for the purpose of housing employees and their families are rea-

sonably incident to the mining, production and removal of oil therefrom.

"4. That the construction of separation tanks, batteries, sump holes and carrying pipe line, and the separation of water from oil on the lease are performances reasonably incident to the mining and removal of oil from the land, and as to using the tank battery located upon Plaintiff's land described as the W½ of Section 25, for the oil produced from the well located on the N½N½ of Section 26, there has been no damage to plaintiffs.

"5. That all things done by the defendants herein are necessary and reasonably incident to the production and removal of oil from said land as allowed under said leases.

\*                              \*                              \*

"7. That there are no growing crops upon the premises or permanent improvements compensable to the plaintiffs and there is no water on said premises polluted by the operations of the defendants.

"8. There has been no damage sustained by plaintiffs as to either crops or improvements upon the lands owned by plaintiffs described as W½ of Section 25 and S½NE¼, Section 26."

In the judgment against the plaintiffs dismissing their action appears a " . . . finding generally in favor of the defendants and against the plaintiffs." The Findings of Fact and Conclusions of Law were prepared and filed October 2, 1953. The judgment was entered October 24, 1953.

Plaintiffs' amended petition contains two causes of action.

### Plaintiffs' First Cause of Action

In their first cause of action, plaintiffs sought to recover possession of the east half of the northwest quarter of the northwest quarter of Section 25 in Township 36 North, Range 64 West of the sixth prin-

cipal meridian in Niobrara County, Wyoming, and also the rents and profits thereof from 1944 to October 1, 1952, in the amount of $9,150, and, also, $800 in addition as damages for withholding possession from plaintiffs from 1944 to "this date," i.e., the 9th day of January 1953. The main contention of plaintiffs under their first cause of action as argued and submitted here is that the defendant oil companies constructed three dwelling houses for the use of their employees. As above recited, these houses are located along the north line of the west half of Section 25 and occupy one and a half acres of ground. Under the Conclusions of Law based on the Findings of Fact by the court herein and also under the general finding in favor of the defendants which the court made in its judgment entered herein, the contentions of the plaintiffs cannot be sustained. It will be recalled as pointed out in Jacoby v. Town of City of Gillette, 62 Wyo. 487, 174 P.2d 505, 506, 514, that:

" '. . . it must be borne in mind that the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it.' "
and that:

"The appellants come here with a general finding of the trial court against them. Concerning the effect to be given such a finding, this court has said in Hinton v. Saul, 37 Wyo. 78, 259 P. 185, at page 191, that: 'And in causes tried to a court, a general finding is one of every special thing necessary to be found to sustain the judgment.'

"And in Wallis v. Nauman, 61 Wyo. 231, 157 P.2d 285, 286, it was pointed out that in Knaggs v. Mastin, 9 Kan. 532, 533, the Supreme Court of Kansas in an opinion assented to by Mr. Justice Brewer said: ' "Where facts are established by a general finding of a court, it

must always be presumed that all the controverted facts are established in favor of the party for whom the court finds, and against the party against whom the court finds." ' "

We have examined the voluminous record herein and have reached the conclusion that the findings of the court are abundantly supported by the evidence introduced on behalf of the defendants and even by that introduced by the plaintiffs to some extent. We note too that the District Court of Appeals of California in Bourdieu v. Seaboard Oil Corporation of Delaware, 38 Cal.App,2d 11, 100 P.2d 528, 533, with statutory language before it such as we have seen is necessarily involved and to be considered in the disposition of the instant case, ruled that:

"The issue of how much of the surface is required for all purposes reasonably incident to the mining and removal of oil and gas or other minerals from the homesteader's land ordinarily would be a question of fact to be determined on trial."

The California Appellate Court denied a petition for rehearing of the case, and the Supreme Court of California declined to docket it or review it.

As the issue of whether the oil company used the lands leased, above-described, for all purposes "reasonably incident" to the mining and removal of oil from said lands was determined by the trial court adversely to plaintiffs after listening to and seeing the witnesses for the several parties, we are unable to see how this court could legally and properly interfere.

The first cause of action in plaintiffs' petition is, as we see it, entirely without merit.

### Plaintiff's Second Cause of Action

It appears generally from plaintiffs' pleading and proofs that they purchased in March, 1945, the main

body of their ranch holdings from one Frank Chambers. These lands embraced deeded property and leased lands also. The 400 acres of land concerning which the parties now present their respective contentions embrace the west half of Section 25 and the south half of the northeast quarter of Section 26, all in Township 36 North, Range 64 West of the sixth principal meridian; but subjected to "all reservations in the original patents contained but specifically conveying to said Grantees" (the plaintiffs) "all claims for damages accrued to the surface of said lands to the date hereof and not heretofore compensated." The grantors in said conveyance are Frank W. Chambers and Leona B. Chambers, and the grantees are Henry B. Holbrook and Hattie B. Holbrook. This conveyance is dated the 25th day of January, 1947.

The prayer of the second cause of action is for general damages in the sum of $25,000, for special damages for the death of a calf in the sum of $85, and for building a reservoir in the sum of $529 on account of plaintiffs' water supply being destroyed and rendered useless by defendants. Relative to this claim of the plaintiffs as to the reservoir construction and the cost thereof, defendants in their answer said:

"That the defendant oil companies have never used any water in their operations upon the lands described in paragraph 1 of each cause of action arising from any source upon said lands, or from any source upon lands owned by the plaintiffs, but have continuously throughout all their operations transported to the said lands described in paragraph 1 of each cause of action, water for their use from wells located about eight miles distant from the said lands, and in so doing have brought to the said lands a source of water supply not theretofore existing, and in addition the oil company defendants have used the tank battery installations on the said lands for the purpose of separating water from oil and a substantial amount of water has been and is

being separated from the oil produced, and said water has been and is being discharged into the stream course known as Little Buck Creek, and *that the said water is potable and usable for stock watering purposes,* and that as the result of the transportation to the said lands of water by the defendant oil companies, and the discharge of water from the oil produced by said companies, there has been in the past several years and is now a larger supply of water in Little Buck Creek than existed prior to the commencement of operations by said oil companies, and as a result thereof, water has been made available and is available for stock watering purposes and for the growing of pasturage which did not exist prior to commencement of operations by the oil companies, and as a result thereof the value of said lands for stock-grazing purposes has been sustantially enhanced." (Italics supplied.)

In this connection, it will be recalled that the trial court found as a matter of fact that the allegation of their answer was true. There is plenty of evidence in the record to support this finding. Nothing seems to be urged in appellants and plaintiffs' brief as to the damages as to the loss of the calf, and it is unnecessary to cite our decisions that under such circumstances the plaintiffs' claim on that account is waived.

It is apparent that plaintiffs and appellants have adopted and pursued in both allegations and proofs an erroneous theory as to their right to recover damages. They have disregarded the rulings of the United States Supreme Court in the litigation which culminated in that court and which was commenced in the United States District Court for the District of Wyoming in the case of Kinney-Coastal Oil Company v. Kieffer, 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961. In the absence of proof of negligent mining operations (and there is no evidence of that in the instant case record), the surface owners, the plaintiffs, can recover only for damages to agricultural improvements or agricultural crops. There are no proofs covering those matters

herein. If there were any, the findings of the district court are against the plaintiffs; and under the rules mentioned above, the matter would be set at rest adversely to plaintiffs and appellants.

The plaintiffs and appellants may not sue for damages to the land but only for injuries to agricultural improvements or agricultural crops. In Weddle v. Parrish, 135 Ore. 345, 295 P. 454, 456, the court said:

"The word 'crop' in its more general signification is said to mean all products of the soil that are grown and raised and gathered annually during a single season. In this sense the term includes both fructus industriales, or annual crops, and fructus naturales, or natural crops. In some instances classification depends on the intention of the parties and on the nature of the transaction involved."

The Kieffer case, supra, was one where a homestead entryman and his vendees sought to establish and maintain a town site on land subjected to mineral lease under the Congressional Acts of February 25, 1920, and July 17, 1914.

It was found by the United States District Court that the mineral lessees needed all the surface of the entry for their drilling operations. With this finding the court of last resort in the interpretation of Federal statutes did not interfere but said (48 S.Ct. 583):

". . . that use of 'practically the entire surface' is necessary 'for the full development' of the underlying oil and gas deposits and for 'reasonably economical, efficient operations' under the lease; that the buildings constructed and intended to be constructed as part of the townsite venture will 'take up space required by plaintiffs in their lawful operations'

"The findings of fact by the District Court before described have such support in the evidence that they should be accepted by us. Two were accepted by the Circuit Court of Appeals, as shown in the quotation

before made from its opinion, and the others were not considered. Those not considered are equally well supported."

The national Supreme Court also said:

"The acts of 1914 and 1920 are to be read together—each as the complement of the other. So read they disclose an intention to divide oil and gas lands into two estates for the purpose of disposal—one including the underlying oil and gas deposits and the other the surface—*and to make the latter servient to the former, which naturally would be suggested by their physical relation and relative values.* The act of 1914, in providing for the disposal of the surface, directs that there be a reservation of the oil and gas deposits, 'together with the right to prospect for, mine, and remove the same,' meaning, of course, the right to use so much of the surface as may be necessary for such operations. And the act of 1920, in providing for the leasing of the oil and gas deposits, provides (section 29) for a reservation of the surface 'in so far as said surface is not necessary for the use of the lessee in extracting and removing the deposits.' In effect therefore a servitude is laid on the surface estate for the benefit of the mineral estate to the end, as the acts otherwise show, that the United States may realize, through the separate leasing, a proper return from the extraction and removal of minerals." (Italics supplied.)

The national Supreme Court further pointed out:

"The only compensation which he rightfully may demand is, as the act of 1914 says, for 'damages caused' by the mining operations. The sentence next preceding that in which these words occur makes it fairly plain that they refer to damages to 'crops and improvements,' and the title to the act, coupled with the reference to 'crops' shows that 'agricultural' improvements are the kind intended."

Elaborating additionally as to the meaning of improvements and crops in the Act of Congress of 1914, the national Supreme Court also indicated (48 S.Ct. 584):

"So, while the provision on which the decision of the

Circuit Court of Appeals rests cannot be held to be an obstacle to the maintenance of this suit in a court of equity, we think it shows a need for modifying the decree of the District Court by providing therein for an ascertainment in this suit of any damages which the plaintffs' entry and operations under the lease may have caused to the *agricultural improvements or crops of the owner* of the surface estates . . . . " (Italics supplied.)

In the case at bar there seem to be no agricultural improvements or agricultural crops established or maintained by the plaintiffs. At least, our attention is not called to any such. Besides, the trial court which saw and heard the parties' witnesses has found adversely in all plaintiffs and appellants' contentions relative to this matter.

By these findings (they are well supported by evidence herein either uncontradicted or conflicting) the point is settled as far as this court is concerned under rules which we have already mentioned above. Of course, if the evidence was conflicting, the district court had the right to resolve the conflict in favor of the defendants. As to that rule, no authorities need be cited as it is so well settled by our own decisions heretofore announced.

The theory of plaintiffs in this case appears clearly in subdivision "IV" of their second cause of action as follows:

"That the defendants have trodden down the grass crops upon the land, strewn oil and refuse and debris upon said lands and in said lands, polluted the water supply of plaintiffs, destroyed fences, left gates open which should be shut, killed livestock, usurped the water supply of the plaintiffs, lowered the water table in and on the land thereby drying up a spring, built roads, culverts, fills, dams upon the land to its detriment and damage, transported oil and gas, machinery, supplies and people upon and across said lands,

and have stored and processed and handled oil and gas upon said lands produced from other lands, without right and have deprived plaintiffs of the full use and enjoyment of their said lands beyond any right which defendants may have had, and destroyed the ranch unit as above set forth, all to the plaintiffs' loss and damage in the sum of $25,000.00"

In passing, we may note that in the Keiffer case, supra, the United States District Court said (1 F.2d 795, 797) :

"The term 'crops' clearly refers to agriculture, and the term 'improvements,' in the connection in which it is found, can reasonably have no other significance than those of an agricultural nature."

This view of the matter, as we have seen, was approved by the Supreme Court of the United States on final disposition of the case.

We conclude there is no merit in plaintiffs' second cause of action.

### *Expenses Incurred by Defendants Relative to Continuance of Trial on Plaintiffs' Application*

It is finally urged that the district court committed prejudicial error because it taxed to plaintiffs one-half of the costs and expenses of a continuance of the trial of the case incurred by the defendants. The situation presented appears to be as follows:

The above entitled cause by a formal order of the District Court of Niobrara County was on February 24, 1953, set for trial on, March 11, 1953, at 9:30 A. M. None of the parties hereto appears to have objected to this order nor was any effort made by any one after the entry thereof to obtain a change or modification of the same.

On March 11, 1953, the defendants appeared with their attorneys and witnesses in the district court

aforesaid and announced that they were ready and prepared for the trial of the cause. However, neither the plaintiffs, their attorneys, nor their witnesses appeared in said court on the 11th day of March aforesaid. They did nothing to advise the defendants prior to the date last mentioned that the plaintiffs and their attorneys would not be present to proceed with the trial on the 11th day of March, 1953, pursuant to the court order setting its trial on that date. However, plaintiffs' counsel sent a letter (marked, mailed at Wheatland, Wyoming, at 2:00 P. M. on March 10, 1953) to the defendants' counsel at Casper, stating that plaintiffs did not intend to be present in the Niobrara District Court at Lusk. This letter did not reach the office of counsel for the defendants until after the time the cause was set for trial, as above-recited. No notice was given defendants or their counsel that plaintiffs would not be in Lusk ready to proceed with the trial as set by the court order aforesaid, and no excuse seems to have been offered why that was not done. So far as appears herein, the telegraphic wires and long distance telephone wires were at all times between the 24th of February, 1953, and the 11th day of March, 1953, available to counsel for plaintiffs. If these facilities had been used, defendants' counsel could have been notified in time to prevent their attendance on the date set and obviated the expenses incurred. One of the defendants has its principal office in Oklahoma and the other in Denver, Colorado.

On March 13, 1953, the defendants' counsel verified their petition for payment of costs wherein they requested that the court order payment to them for the actual expenses in the sum of $538.17 incurred in bringing counsel and witnesses to Lusk on the date set for trial as above-recited. This petition, with plaintiffs' answer thereto, was presented to the court on April

27, 1953. It seems that on March 11, 1953, the plaintiffs had requested the judge of said court over the long distance telephone to postpone and continue the trial of the cause to a later date. This was apparently done for the case was not tried until September 2, 1953.

On April 27, 1953, the court entered the following order:

"IT IS HEREBY ORDERED that plaintiff shall pay the defendants the sum of $269.08, and that until such payment is made all proceedings herein shall be and hereby are stayed and that plaintiffs shall not be permitted to proceed further with this cause or to try the same until such payment is made."

Subsequently, the plaintiffs paid the amount thus ordered, which, it will be noted was one-half of the amount actually expended by the defendants in obeying the court's order of February 24, 1953, and being in Lusk ready for trial on the day set by the court order heretofore mentioned.

Our statutes relative to the matter are:

"Any court, for good cause shown, other than the absence of evidence, may continue any action at any stage of the proceedings, at the cost of the applicant, to be paid as the court shall direct." (W.C.S., 1945, § 3-2002)

"Unless otherwise provided by statute, the costs of motions, continuances, amendments, and the like, shall be taxed and paid as the court may direct." (W.C.S., 1945, § 3-3726)

We note that 17 C.J.S. Continuance § 5 says that it is a general rule "that the granting or refusing of a motion for continuance is wholly or largely within the sound discretion of the trial court." The same text also states at page 271:

"Where a party accepts the conditions on which a continuance is granted, which he may do by accepting the continuance, or by failing to waive it promptly, he cannot afterward complain that the court exceeded its power."

In Richardson v. Michigan Bell Telephone Company, 256 Mich. 444, 240 N.W. 65, 66, the court said:

"Defendant's right to costs, if continuance were granted, was clear. Plaintiff had the option of refusing continuance on the terms ordered or of accepting it. If he was not content with the conditions, he should have made his showing in opposition, refused to accept the continuance, and put his refusal and reasons upon the record for the purpose of review. The record does not indicate that he objected to the terms on any ground or that he refused the continuance. By accepting the continuance, he accepted its terms, and thereby lost his right to attack them as an abuse of discretion. 13 C. J. p. 194; Barney v. Love, 101 Mich. 543, 60 N. W. 58."

Under the circumstances appearing before us in the record, we must decline to interfere with the judgment of the district court dismissing the case, believing as we do that a correct result was reached. Accordingly, we think we should order an affirmance of that judgment.

*Affirmed.*

BLUME, J., AND HARNSBERGER, J., concur.