**Lawrence E. GILBERTZ and Verna Ann Gilbertz, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 84–1323.**

United States Court of Appeals, Tenth Circuit.

Jan. 7, 1987.

Rehearing Denied Feb. 23, 1987.

James A. Clark (Claude M. Maer, Jr. with him on the brief), of Baker & Hostetler, Denver, Colo., for plaintiffs-appellees.

Steven Frahm of the Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, William S. Estabrook, and Mary L. Fahey, Attys., Dept. of Justice, Washington, D.C., and Richard Allen Stacy, U.S. Atty., Cheyenne, Wyo., with him on the briefs), for defendant-appellant.

Before HOLLOWAY, Chief Judge, MOORE, Circuit Judge, and THEIS, District Judge.*

JOHN P. MOORE, Circuit Judge.

The government appeals from a judgment of the United States District Court for the District of Wyoming awarding Lawrence E. and Verna Ann Gilbertz (Taxpayers) a tax refund of $37,557 and $9,314.66 assessed interest for the 1977 tax year. *Gilbertz v. United States,* 574 F.Supp. 177 (D.Wyo.1983). The issue before us is whether the district court properly characterized payments of approximately $111,-800 received by Taxpayers in 1977 as the recovery of capital gains from the sale of a capital asset. Upon our review of the record and the briefs submitted by the parties, we reverse in part, affirm in part, and remand for a determination of apportionment consistent with this opinion.

## I.

### Background

Taxpayers, husband and wife, raise cattle on their 6,480-acre ranch in Campbell County, Wyoming. Although they hold title to all the surface rights in their land, Taxpayers own only a fractional interest in the mineral rights. The federal government has reserved most of the mineral rights pursuant to the Stock Raising Homestead Act of 1916, 43 U.S.C. § 299 (the Act).

In 1973, the government issued federal oil and gas leases to individuals and companies to explore and develop the minerals underlying the Gilbertz Ranch. Subsequently, in 1976 and 1977, Mr. Gilbertz negotiated more than fifty contracts with oil and gas lessees and pipeline companies to receive payments in connection with their anticipated drilling activities on the ranch. These contracts were in essentially two forms: releases from damage claims and the sale of easements. Although most of the contracts were executed with Davis Oil Company and several pipeline companies, the Gilbertzes also received payments from surveying and engineering firms, public services, and other companies. The bulk of the payments at issue in this litigation related to well sites, tank batteries, roads, and pipelines used to develop the mineral rights beneath the Gilbertz Ranch.[1] However, Diamond Shamrock Corporation (Diamond Shamrock) made one payment to Taxpayers for an access road across their ranch to develop the mineral rights on the adjoining property.

Taxpayers then filed their 1977 tax return and characterized all payments received pursuant to these contractual agreements as recovery of capital. Taxpayers applied the payments against their basis in the entire ranch and treated the excess as capital gains. The Commissioner of Internal Revenue disagreed, determined all of the payments to be ordinary income, and assessed a deficiency. The Gilbertzes paid the deficiency and sued for a refund in the United States District Court for the District of Wyoming.

The parties made the following stipulations. First, oil and gas activity was projected to last fifteen to fifty years; when production ceased, the structures and equipment of the oil and gas companies would be removed. Second, the oil and gas companies and pipeline companies had agreed to a rehabilitation plan to reshape and reseed the affected areas when production stopped. Third, the exploration and drilling activity on sections of the ranch had increased the traffic, noise, and dust on the entire ranch. Finally, Taxpayers had reduced the carrying capacity of their ranch by 20% in response to the oil and gas activity.

In the one-day trial to the court, Mr. Gilbertz testified that his intent in agreeing to the releases from damages was to protect himself from the unreasonable use of

---

* Honorable Frank G. Theis, Senior United States District Judge for the District of Kansas, sitting by designation.

1. No royalty payments are involved in this litigation.

his property, to negotiate a figure for excessive damages caused by negligent operations, and to avoid costly and continual court battles. Taxpayers presented pictures of the areas affected by the oil and gas operations and testified to the permanent destruction of the natural grasses on the acreage utilized by the lessees and pipelines. Mr. Gilbertz also testified to the disruption in the management of the ranch in 1977 and the continuing problems caused by the presence of the oil and gas operations. Mr. Gilbertz stated that after the minerals were exhausted and the equipment had been removed, "restoration" of the affected acreage would be virtually impossible based on his prior experiences with attempts at reclaiming abandoned uranium exploration holes. A reclamation expert testified that "reclamation" of the affected land would cost $1.2 million. Mr. Gilbertz testified that he intended to purchase additional land as it became available to return the ranch to its pre–1977 holding capacity.

In the trial court, the government argued that the payments at issue were in the nature of rent and, therefore, should be characterized as ordinary income. To support this theory, the government cross-examined Mr. Gilbertz, who testified that prior to 1977 the ranch had shown a loss only one year; but after the oil and gas development, it began operating at an annual net loss. The government sought to prove the payments received were intended to compensate Taxpayers for the loss of farm income due in part to the falling price of livestock. The government presented evidence that the ranch, which was appraised at between $500,000 and $600,000, had suffered less than a $10,000 decrease in value due to the oil and gas activity on the property. Finally, the government presented evidence on the palatability of the grasses used in reclamation to rebut the Taxpayers' arguments that the acreage used for oil and gas operations had suffered permanent damage.

After presentation of the evidence, the trial court trisected the contract payments at issue and made the following conclusions. First, the payment contracts with

mineral lessees, "Release and Damage Payments," provide a release from liability for surface damages relating to the development of the mineral rights and are not in the nature of rent. Thus, these payments cannot be characterized as ordinary income. Second, the payments from pipeline companies for rights-of-way and damage to the land are subject to capital gains treatment, the court holding the transfers to be easements, interests in real property or a capital asset. Third, because the court also found the transfer of the right-of-way to Diamond Shamrock to be an easement, this payment would receive capital gains and not ordinary income treatment. In each instance, the trial court considered the terms of the written agreements, the intent of the parties, and applicable precedent. We follow this guide and address each area of payment seriatim.

## II.

### Release and Damage Payments From the Oil and Gas Companies

A typical "Release and Damage Payment Receipt" executed by the Taxpayers and Davis Oil Company provided for the payment of $2,096 as the

> full payment, settlement and satisfaction of all detriment, injuries and damages of whatsoever nature and character, growing out of, incident to, or in connection with … [the Gilbertz No. 2 well] caused by the moving in, removing of derrick drilling tools, vehicles, and all other machinery and equipment necessary or incident to the drilling, testing, completion of said well for oil and gas, and for the same consideration, the undersigned does hereby release, acquit, and discharge the said DAVIS OIL COMPANY of and from any and all claims for detriment, injuries, and damages as set out above.
>
> OTHER CONSIDERATIONS:
>
> It is specifically understood that this payment covers all damages arising from the use of a well location and the road thereto, but does not include any dam-

ages to the personal property or other property of the undersigned landowners. This particular contract called for a one-time payment of $1,000 for the tank battery location and annual payments of $1,096 for the tank battery, well site, and 896 rods of access road.[2]

After reviewing the agreements and Mr. Gilbertz' testimony on his intent in signing the releases, the district court determined that the payments received by the Taxpayers were "compensation for the damage caused or sure to be caused to the land." Moreover, in response to the government's arguments, the court stated, "[T]here is simply no indication that the payments were intended to be rent." Therefore, the Taxpayers were entitled to treat the payments relating to these various contracts as recovery of capital. The district court erred, however, in failing to consider the limited damage claims these Taxpayers could have brought against the oil and gas companies under the Act and the actual damages suffered.

■ Surface damage payments are commonplace in landowner-mineral lessee relations.[3] The tax consequences which attach to these payments must be determined by examining their nature and what they were intended to compensate. *Raytheon Production Corp. v. C.I.R.*, 144 F.2d 110 (1st Cir.), *cert. denied*, 323 U.S. 779, 65 S.Ct.

192, 89 L.Ed. 622 (1944). *See also* Rev.Rul. 73–161, 1973–1 C.B. 366; *Henshaw v. C.I.R.*, 23 T.C. 176 (1954).[4] In *Raytheon*, the First Circuit summarized the analysis to be followed by asking, "In lieu of what were the damages awarded?" 144 F.2d at 113. *See also C.I.R. v. Glenshaw Glass Co.*, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955). In our case, we must ask what surface rights were the payments designed to compensate or redress? Although *Raytheon* held it is immaterial to the inquiry whether the taxpayer effects collection of payments for damage claims by resolving the dispute through compromise or by litigation, courts continue to scrutinize payments made for the release of possible future claims to insure that the taxpayer is in fact compensated for actual damages. *See Starrels v. C.I.R.*, 304 F.2d 574 (9th Cir.1962); Rev.Rul. 73–161. If payments are found to compensate a property owner for damage or destruction of his land or property rights, these payments generally are characterized as a recovery of capital. *Inaja Land Co., Ltd. v. C.I.R.*, 9 T.C. 727 (1947); *Pioneer Real Estate Co. v. C.I.R.*, 47 B.T.A. 886 (1942). Finally, the Act must bear on our analysis of a taxpayer's right to damages to limit our application of these general principles. *Holbrook v. Continental Oil Co.*, 73 Wyo. 321, 278 P.2d 798 (Wyo.1955).[5]

---

2. The record includes 17 similar releases signed by Mr. Gilbertz and Davis Oil Co. with payments totaling $40,581. Another payment of $2,500 was not related to any written contract. These contracts were tied to wells drilled on the Taxpayers' ranch.

   Payments relating to location sites and roads were also made by Michigan-Wisconsin Pipeline Co., Woods Petroleum Co., and other miscellaneous companies. Although the record indicates these payments totaled $24,355, many of them were not made pursuant to a written contract. Total payments relating to well sites, tank batteries, and roads incident to drilling on the Gilbertz ranch were $67,436.

3. In recent years several states have enacted surface damage acts which are "aimed at protecting agricultural and ranching uses from disruption by oil and gas operations." Lowe, *Developments in Nonregulatory Oil & Gas Law: Issues of the Eighties*, 35 Inst. on Oil & Gas L. & Tax'n 1, 22 (1984). We compare the approach

taken by these legislative acts as discussed in the Lowe article to the cynical view expressed in Sellers, *How Dominant is the Dominant Estate? or, Surface Damages Revisited*, 13 Inst. on Oil & Gas L. & Tax'n 377 (1962).

4. *See generally* 1 Mertens, *Law of Federal Income Tax* § 6A.21, at 95 (1986); C. Russell & R. Bowhay, *Income Taxation of Natural Resources* ¶ 15.05 at 1504 (P–H 1986); Ernst & Whinney, *Energy Resources Tax Reporter* ¶ 609 at 812 (CCH 1983).

5. *See Vest v. C.I.R.*, 57 T.C. 128 (1971), *rev'd on another issue*, 481 F.2d 238, *cert. denied*, 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1972), where the government argued that taxpayers were not entitled to capital gains treatment of payments for well and road locations because of the implied easement to use so much of the surface as may be necessary to exploit the leased minerals. The court looked beyond this

Under the Act, the mineral estate is severed from the surface estate in order to encourage the *"joint use* of the surface of the land by the entryman ... and the person who shall acquire from the United States the right to prospect, enter, extract and remove all minerals that may underlie such lands." *Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 50, 103 S.Ct. 2218, 2226, 76 L.Ed.2d 400 (1983) (quoting H.R.Rep. No. 35, 64th Cong., 1st Sess. 4, 18 (1916)). The mineral lessee "may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of the coal or other minerals ... upon payment of the damages to crops or other tangible improvements to the owner...." 43 U.S.C. § 299. *Kinney-Coastal Oil Co. v. Kieffer,* 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961 (1928).

The Act comprehends the lessee's right to entry as "beyond doubt" once certain conditions precedent are performed. *Reno Livestock Corp. v. Sun Oil Co.,* 638 P.2d 147 (Wyo.1981). Under the Act, the lessee must give notice of entry and post a bond to protect the surface owner from damages to crops and tangible improvements.[6] 43 U.S.C. § 299. Alternatively, the lessee must secure the written consent or waiver of the landowner for his entry or undertake payment of an agreed amount of damages to crops or other tangible improvements. 43 U.S.C. § 299. In *Bourdieu v. Seaboard Oil Corp.,* 38 Cal.App.2d 11, 100 P.2d 528 (1940), the court considered these preconditions to entry "to protect the homesteader in *his limited right* to use the surface." *Id.,* 100 P.2d at 534 (emphasis added). However, under the Act, "a servitude is placed upon the surface estate, but the obligation is placed upon the holder of the dominant estate ... to pay the owner of the servient estate for the damages caused thereby." *Id.,* 100 P.2d at 532.

The lessee's liability, thus, is derived from and limited by the Act. The lessee may use as much of the surface "for all purposes reasonably incident" to the drilling or mining operations. 43 U.S.C. § 299. However, use of more of the surface than needed and negligence, damages to crops, and tangible improvements may be recovered under the Act. *Reno Livestock,* 638 P.2d at 151.

In *Holbrook v. Continental Oil Co.,* 278 P.2d at 798, the landowner, a patentee under the Act, brought suit against the mineral lessee to recover damages for unauthorized possession of the land to construct dwelling houses for employees of the lessee, the death of a calf, and destruction of the water supply. The Wyoming Supreme Court held the landowner was not entitled to recover damages under the Act. "In the absence of proof of negligent mining operations (and there is no evidence of that in the instant case record), the surface owners ... can recover only for damages to agricultural improvements or agricultural crops." *Id.* at 804. The court held the landowner was not entitled to sue for damage to the land or to the natural grasses. *Id.* at 805–06.

In our case, Taxpayers sought capital gains treatment of lessee payments by arguing that the payments from the oil and gas companies were compensation for unreasonable, excessive, and negligent operations on their land and the resultant damage to the land. However, although the court granted capital gains treatment to the payments, there was no finding that the oil and gas operations were conducted in a negligent fashion or that the operations were occupying more of the land than was reasonably necessary for the extraction of the minerals under the leases. Nor can we find evidence in the record to fill this void. The Taxpayers not only failed to proffer evidence of any unreasonable, excessive, or negligent use, but also failed to

general principle of oil and gas law to determine that, under Texas law, the lessor of mineral rights may condition and demand payment for the use of the surface by the lessee.

6. There is no evidence in the record that a bond was posted by the oil and gas companies.

prove the oil and gas companies' activities on the land were not customary or incidental to their operations.

Moreover, the contracts between the oil and gas companies and the Taxpayers cover "all detriment, injuries and damages of whatsoever nature and character, growing out of, incident to, or in connection with" each drilling location. Mr. Gilbertz testified that any damage inflicted to property beyond the drilling areas would not be covered by the agreements.[7] However, the Taxpayers failed to establish that these well sites were unreasonably located, excessively large, or that the operations on the locations were not incident to drilling. Under *Holbrook,* permanent damage to the natural grasses which previously grew on these well and road locations is not compensable so long as disruption of the land is necessary and incident to the extraction of the minerals. *See also Kinney-Coastal Oil Co. v. Kieffer,* 277 U.S. at 488, 48 S.Ct. at 580; *Transwestern Pipeline Co. v. Kerr-McGee Corp.,* 492 F.2d 878 (10th Cir. 1974), *cert. denied,* 419 U.S. 1097, 95 S.Ct. 691, 42 L.Ed.2d 689(1975).[8]

Absent a finding of negligent, unreasonable, or excessive operations, we have before us payments made in anticipation of the limited damages contemplated by the Act and provided for by contract. The trial court's considering the Taxpayers' bargaining power in executing the contracts with the oil and gas companies, while the federal government held all the mineral rights, is not cognizable under the Act. Taxpayers sought reimbursement for actual damages caused to their surface rights as permitted by the Act. To characterize these payments as a return of a capital asset presumes a use of Taxpayers' land not supported by the evidence and a disregard of the limited damages permitted by the Act.

We agree with those courts which have expressed concern over the potential for abuse in allowing a taxpayer to characterize payments as compensation for future injury to capital assets where no compensable injury has in fact occurred. *See Starrels v. C.I.R.,* 304 F.2d at 574; *Franklin D. Roosevelt, Jr. v. C.I.R.,* 43 T.C. 77 (1964); Rev.Rul. 73–161. The district court erred in failing to require evidence of actual, unreasonable, and excessive use of the surface or negligent operations where the payments were made in advance to compensate for future anticipated damages. Taxpayers have not established that the $67,436 received as payment for releases for damages from the oil and gas companies was compensation for damages to the land cognizable under the Act.

Similarly, Taxpayers received $835 from Tri-County Electric and two uranium exploration firms. Aside from their classification of "Other Types of Payments," no written contracts or other evidence in the record is available to satisfy the Taxpayers' burden of proving that this payment qualifies for capital gains treatment. *Aluminum and Metal Service, Inc. v. C.I.R.,* 24 T.C.M. (CCH) 660, 662 (1965). We, therefore, reverse that portion of the trial court's opinion holding these payments from mineral lessees and the other miscellaneous payments represent a recovery of basis in the ranch.

---

**7.** The Taxpayer presented photographs of an oil spill which allegedly damaged grazing land beyond the borders of the fenced well location. He admitted that the oil and gas company had brought in topsoil twice and reseeded in an attempt to reclaim the land. The Taxpayer also intimated that he intended to sue for damages for negligent operations if the reclamation was unsuccessful.

**8.** Mr. Gilbertz testified that the actual damages caused by the oil and gas operations, other than the disruption of the natural sod, included management problems caused by the increased traffic, noise, and dust, and additional fences and autogates requiring constant checking. In addition, the Taxpayer testified that he had reduced the size of his herds partially in response to his having to share the surface with the mineral lessee. He also testified that he lost an annual cash crop because his herd was consuming all of the winter foraging after the oil and gas operations occupied some of his winter pastures. This evidence strongly suggests that the payments compensated the Taxpayers for the interruption in their business operations and lost profits, which are characterized as ordinary income. *Schnadig Corp. v. Gaines Mfg. Co.,* 620 F.2d 1166 (6th Cir.1980).

## III.

### Payments from the Pipeline Companies

The Taxpayers signed six "Right of Way Easement" contracts (Easement Contracts) with the Phillips Petroleum Company conveying

the right to construct, maintain, inspect, operate, protect, repair, or remove one pipeline and appurtenances necessary for and incident to, the operation and protection thereof, for the transportation of oil, gas, petroleum or any of its products.

The Gilbertzes negotiated Easement Contract grants and "Release and Agreement" contracts with the Powder River Pipeline Company, the Belle Fourche Pipeline Company, and Western Oil Transportation Company.[9]

The district court held that the Easement Contracts granted the pipeline companies perpetual easements rather than licenses. The court also found that the Release and Agreement contracts provided for releasing the pipeline companies from any further liability for damages. The court rejected the government's contention that these payments were in the nature of rent and, instead, accorded them capital gains treatment.

On appeal, the government argues Taxpayers never owned the access routes for removal of the minerals and, therefore, had no property right to sell to the pipeline companies and no right to damages. The government's argument is premised on 43 U.S.C. § 299, which grants to "[a]ny person who has acquired from the United States the ... mineral deposits" in any patented land the right to enter and occupy the surface as required for all purposes reasonably incident to the mining *or removal* of the minerals. The government contends the full implication of the mineral lessee's

predominance over the rights of the surface estate effectively obliterates the surface owner's interest in the land.

In response, Taxpayers contend the contracts at issue expressly provide for a grant and conveyance, reserve no reversionary interest to Taxpayers, and contain words of inheritance. Thus, Taxpayers aver the court's characterization of the easement grant as the sale of an asset used in a trade or business subject to capital gains treatment is appropriate.

■ In order to qualify income for capital gains treatment, the taxpayer must prove the income arose from the sale or exchange of a capital asset held for the statutory holding period of time. 26 U.S.C. § 1222(3). Payments received as compensation for damage to land, a capital asset, constitute a recovery of basis. *Inaja Land Co., Ltd. v. C.I.R.*, 9 T.C. at 727.[10]

■ The granting of an easement may constitute the sale or exchange of a capital asset. Rev.Rul. 59–121, 1959–1 C.B. 212. Where the transferred land was used by a taxpayer in his trade or business and held for more than six months, any recognized gain from the granting of a portion of that land as an easement receives capital gains treatment. *Fasken v. Commissioner*, 71 T.C. 650 (1979); Rev.Rul. 59–121. However, where the conveyance of an easement is found to be limited to the time required to remove the minerals or subject to reversion for nonuse, the grant does not constitute the "sale" of a capital asset but is a lease or license. *Nay v. C.I.R.*, 19 T.C. 114 (1952); *Fasken*, 71 T.C. at 656 n. 3; *Vest v. C.I.R.*, 57 T.C. 128, 147 (1971), *rev'd on other grounds*, 481 F.2d 238 (5th Cir.), *cert. denied*, 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973).

---

**9.** Payments from all the pipeline companies totaled $37,885.71.

**10.** In Rev.Rul. 73–161, the Commissioner considered the tax consequences of a lump sum payment for damages caused by the construction of a pipeline. The Commissioner adopted the traditional recovery of basis analysis used in *Raytheon Production Corp. v. C.I.R.*, 144 F.2d at

110, and *Inaja Land,* but found that, although the agreement specified that damages to fences, improvements, and crops were included in the advance payment, the only damage incurred at the time of the payment was an anticipated loss of rental income due to crop curtailment. Therefore, taxpayer was not entitled to treat the payment as return of capital.

Generally, pipeline companies acquire a right-of-way to construct and maintain a pipeline by condemnation proceedings or by negotiations with the landowner. *See, e.g., Transwestern Pipeline Co. v. Kerr-McGee Corp.,* 492 F.2d at 878; *True v. United States,* 603 F.Supp. 1370 (D.Wyo.1985); 30 U.S.C. § 185; Wyo.Stat. § 1–26–303 (1977). *See generally* 61 Am.Jur.2d *Pipelines* §§ 20–55 (1981). There is no evidence in the record to indicate the pipeline companies here possessed rights to the easements other than by purchase from the Taxpayers.

■ On the contrary, the record supports the trial court's characterization of the agreements. The court found the documents granted a perpetual right-of-way in favor of the pipeline companies. Although the contracts are silent as to the duration of the easement, Mr. Gilbertz testified that the easements were not intended to be tied solely to the production on his ranch, but that the pipeline companies had purchased the right to use the easements for transportation of oil and gas extracted from other oil fields developed in the future. Although the documents provided that the easements will revert to the grantors upon abandonment by the pipeline companies, without more, this contingent right of reversion is insufficient to defeat a sale under the tax statutes. Moreover, there is evidence in the record to indicate that the construction of the pipelines permanently disrupted the natural grasses and that Taxpayers have suffered damage to their grazing lands as a result. Accordingly, we affirm the trial court's holding that the $37,885.71 received from the pipeline companies should be characterized as the sale of a capital asset and recovery of basis.

## IV.

### Payments from Diamond Shamrock

■ The Taxpayers and Diamond Shamrock executed a "Surface and Damage Agreement" which granted the latter "the right-of-way and easement" across the Gilbertz Ranch to build a road accessing a well drilled on the property of an adjoining landowner. The agreement provided for payment in 1977 of $5,642. Diamond Shamrock agreed to pay $2 per rod for the right-of-way and $1 per rod for surface damages for the first year of use. Use of the road each successive year would cost $1 per rod. The damage payments were to compensate the Taxpayer "in full for damages, caused or created by reason of the reasonable and customary entry, rights-of-way, drilling operations and subsequent operation of said ... road." Additional damage payments would be assessed for injury to fences, cattle guards, failure to maintain fences and gates installed by Diamond Shamrock, and extraordinary loss or damage. Upon termination of its oil and gas lease on the adjoining property, Diamond Shamrock agreed to a "quit claim and termination of the rights" to the right-of-way.

The trial court held that the document created an easement and that the payment should be treated as capital gain. We disagree and find the requisite indicia of a sale absent from this transaction.

The parties agree that under the Act, the mineral lessee does not own the right to use adjacent property for mining activities. *Mountain Fuel Supply Co. v. Smith,* 471 F.2d 594 (10th Cir.1973); *Bourdieu v. Seaboard Oil Corp. of Delaware,* 100 P.2d at 528. Therefore, the Taxpayers possessed a property right to sell to Diamond Shamrock an access way to the adjoining drilling site. Nevertheless, we cannot agree that the contract constituted a "sale."

In *Vest v. C.I.R.,* 481 F.2d at 238, *aff'g on this issue,* 57 T.C. at 146–47, the taxpayers owned the mineral rights and the surface rights to the property. The taxpayers signed an agreement with Standard Oil which required Standard Oil to make payments to the taxpayers for well locations, tank batteries, flow lines, and roads necessary for the development of the mineral rights. The annual payments for these surface rights were to continue for five years and so long thereafter as the minerals were produced. In the tax court, the taxpayers contended the payments

were compensation for the sale of easements. On appeal to the Fifth Circuit, the taxpayers argued these payments were intended to restore the depreciation in the surface value of the land and to last an indefinite period of time. 481 F.2d at 245. The Fifth Circuit disagreed. The appellate court observed that although no one could predict precisely when the payments would terminate, it was indisputable that the usefulness of the surface rights (and consequently the payments for those rights) would terminate when the minerals were exhausted. The surface rights would then revert to the taxpayers or their successors in interest. The Fifth Circuit concluded that the oil company's payments for the surface rights were in the nature of rental income. *See also Linebery v. United States*, 512 F.2d 510 (5th Cir.1975).

In our case, the contract expressly provides that upon termination of the oil and gas lease on the adjoining property, the right-of-way will revert to the Taxpayers. This reversion is not contingent, for it will definitely occur within a finite term of years. Under these circumstances, we hold the agreement at issue is in substance a lease. Accordingly, the payment received from Diamond Shamrock is to be treated as ordinary income.

## V.

### Apportionment

Finally, we address the question of apportionment. In a letter responding to the Taxpayers' attorney's inquiry after the trial court handed down its Memorandum Opinion, the district court stated, "[T]he damages and easements affect the ranch as a whole and I so hold." When the trial court later entered judgment, the order stated that Taxpayers were entitled to apply the 1977 payments against their basis in the entire ranch and treat the excess payments as gain from the sale or exchange of a capital asset. In light of our substantial reduction of the trial court's award to the Taxpayers, we remand for additional factual findings consistent with this opinion.

■ "[W]here property is acquired for a lump sum and interests are subsequently disposed of separately in order to compute the gain or loss from each disposition, an allocation or apportionment of the cost or other basis to the several units must be made." *Fasken v. Commissioner*, 71 T.C. at 656–57; Rev.Rul. 73–161. "Whether apportionment of a definite basis to the property affected by the easement grant reasonably cannot be made is an issue of fact" on which the taxpayer has the burden of proof. *Fasken*, 71 T.C. at 657. These principles must be applied to the grants of easements to oil and gas companies. Unless such an apportionment of the basis is impossible or impracticable, only the basis allocable to the affected portion of land is reduced by the consideration received by the taxpayer. *Id.* Any excess over basis constitutes recognized gain under 26 U.S.C. § 1231. Rev.Rul. 59–121.

The Taxpayers argue there is evidence in the record to support the trial court's finding that the entire ranch was affected by the oil and gas operations. They emphasize that the evidence established there was "continual traffic all hours of the day and night, blowing dust, scattered trash and all kinds of upsetting activities both to the livestock and to the management." However, in reversing the trial court's characterization of the damage payments from the oil and gas companies, we noted that these damages are more in the nature of lost profits and interruption of ranching operations than damages to the land. *Infra* at n. 8. Therefore, we remand and instruct the district court to determine what specific portion of the ranch is affected by the grant of easements to the pipeline companies and the damage to the native sod caused by the construction of the pipelines. Alternatively, if apportionment is impossible or impracticable, we instruct the trial court to make specific findings to that effect consistent with this opinion.

In summary, we reverse the trial court's holding the payments from oil and gas companies, other miscellaneous payments,

and the Diamond Shamrock payment are subject to capital gains treatment. We affirm the capital gains treatment accorded to payments from the pipeline companies, and we remand for factual findings on the allocation of basis.