**COMMONWEALTH NATURAL GAS CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**COMMONWEALTH GAS DISTRIBUTION CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 3690, 4309, 3691 and 4310.**

United States District Court
E. D. Virginia,
Richmond Division.

Dec. 22, 1966.

H. Brice Graves, E. Milton Farley, III, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Myron C. Baum, Arthur L. Biggins, Attys., Tax Division, Dept. of Justice, Washington, D. C., C. Vernon Spratley, Jr., U. S. Atty., S. W. Phillips, Jr., Asst. U. S. Atty., Richmond, Va., for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUTZNER, District Judge.

Four cases for refund of taxes were consolidated for trial by the court without the intervention of a jury. The cases present these issues: First, whether easements for transmission of natural gas are depreciable; and second, the allocation of costs between the pipeline and the easements.

Commonwealth Natural Gas Corporation is a Virginia corporation organized in 1947 to sell natural gas to retail distributors. Its gas is transported in its own pipelines. Commonwealth completed construction of its original transmission line in 1950 from a connection with lines owned by the Atlantic Seaboard Corporation in Greene County, Virginia to terminals at Norfolk and Newport News, Virginia. By the end of 1960 Commonwealth had constructed a loop adjacent

to the first line. It owns 350 miles of pipeline.

Commonwealth buys its entire supply of natural gas from the Atlantic Seaboard Corporation. It sells this gas on a wholesale basis to public utilities, large industries, and its wholly owned subsidiary, Commonwealth Gas Distribution Corporation.

Commonwealth Gas Distribution Corporation is a Virginia corporation organized in 1955 to retail gas. It has fifteen miles of pipeline.

We will first consider the question of depreciation of the easements for transmission of natural gas.

The parties have stipulated that all gas reserves and resources which are available or discovered east of the Rocky Mountains are a source of supply for the taxpayers' pipelines. The parties have also stipulated that the taxpayers will receive their fair share of these gas resources. For that reason it is unnecessary to explore in detail the plaintiffs' contractual arrangements with producers.

Natural gas reserves exist in nature in a finite amount. The term "proved reserves" refers to the quantities of natural gas in the ground which are known to exist with the greatest degree of certainty. These reserves are estimated annually by the Reserves Committee of the American Gas Association. They are the only annually reported reserve figures compiled from individual fields. These estimates are used by the gas industry and by agencies such as the Federal Power Commission.

The "reserves-production ratio," sometimes referred to as the "life index," is the ratio of proved reserves at the end of a given year to the net production during that year. Net production, also reported annually by the Reserves Committee of the American Gas Association, represents total production reduced by the small quantity of gas that is reinjected into the earth after production. Net production, reduced by the quantity of the gas that is wasted or lost, is equivalent to demand.

There are other kinds of reserves of natural gas referred to as "probable" and "possible" reserves. There is no uniform definition for these terms, but they refer to quantities of gas that are known to exist with less certainty than the proved reserves. Estimates of probable and possible reserves frequently are made for individual fields, but never has there been any compilation of these reserves on a state, regional, or national basis. Gas in the ground exists in two additional categories. The first is gas that is known for a fact to exist but which is considered unrecoverable at this time due to physical, geographical, or economic circumstances. The other is gas that can be presumed to exist although it has not yet been discovered.

The "resource base" is the entire quantity of gas that exists in the earth's crust beneath the United States. This term embraces the reserves mentioned above, known but unrecoverable resources and undiscovered resources. Proved reserves constitute but a small portion of the resource base.

The reserves-production ratio for all the states east of the Rocky Mountains for the years in question was: 1957, 21.3:1; 1958, 21.7:1; 1959, 21.1:1; 1960, 20.4:1. This ratio is only a rough measure of the relation between production in a given year and the reserves behind that production. It does not measure the absolute life of the reserves. Because of the physical circumstances surrounding the occurrence and production of natural gas, it is not possible for any individual field or reservoir to maintain its initial rate of production to the terminal year. The duration of the ability to maintain production at the initial level is known as the "deliverability life." The exact relation between the deliverability life and the reserves-production ratio varies from reservoir to reservoir, but as a rule of thumb a reserves-production ratio of 20 to 1 is equivalent to a deliverability life of 12 to 14 years. Another overstatement of the reserves-production ratio is that it does not take into account the growth in demand and

production. On the other hand, the proved reserves contain a highly conservative element. There are other categories of known reserves, and there are also quantities of gas that undoubtedly will be discovered.

Natural gas reserves are depleted by use, and such reserves will be available for a limited time which can be estimated with reasonable accuracy. A life of twenty to twenty-one years based on the reserves-production ratio offers the appeal of a mathematical computation, but it is entirely too limited. It does not take into consideration the fact that gas has been discovered in the past and the expectation that gas will be discovered in the future. The minimum period of time, therefore, is approximately twenty years, but this is an unrealistic minimum. The maximum period of time, based on the resource base and the expectation ·that gas will be discovered and utilized in accordance with past trends is in excess of 100 years, but this is a speculative and unrealistic maximum.

Closely related to the production and consumption of gas is the technology that influences its discovery, production, and consumption. A general life of technology occurs over a span of approximately twenty to twenty-five years, and if we go very far beyond that period all possibilities are open and we have almost nothing to go on. Technology, considered along with the other factors which the court has mentioned, assists in the estimation of the time that natural gas reserves will last with reasonable accuracy. Evidence before the court demonstrates that thirty years is a reasonable measure of the life of the natural gas reserves available to the taxpayers for the years in question. This period of time is based upon data which is presently known and can be projected into the foreseeable future.

The pipelines and the easements owned by the taxpayers cannot be readily used for other products. The standard form of right-of-way agreement gives the taxpayers the right to operate the gas pipelines for transportation of other commodities. The standard form, however, was not always used.

Commonwealth is limited to transmission of natural gas with respect to 288 highway crossings involving nineteen counties, cities and towns; thirty railroad crossings; fourteen river crossings, including two James River crossings of approximately five miles each; twenty-one right-of-way agreements; and twenty-five easements acquired by condemnation covering 8.7 miles. Distribution is limited to transmission of natural gas with respect to thirty-three highway crossings, 1500 feet located on a highway right of way; four railroad crossings; and sixteen right-of-way agreements.

Pertinent provisions of the Internal Revenue Code of 1954 and the regulations are:

§ 167 Depreciation. [26 U.S.C. § 167]

(a) *General Rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or .

(2) of property held for the production of income.

\* \* \* \* \* \*

Treas.Reg. § 1.167(a)–1 (1956) *Depreciation in General.*

(a) *Reasonable allowance.* Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value will at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided

in section 167(g) and § 1.167(g)–1. * * *

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. * * *

Treas.Reg. § 1.167(a)–3 (1956) *Intangibles.*

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allow-ance will be premitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. * * *

■ The principles applicable to this issue are set forth in Northern Natural Gas Co. v. O'Malley, 277 F.2d 128 (8th Cir. 1960), which is the only reported final decision dealing with depreciation of easement costs of gas transmission lines. Depreciation was allowed. Notwithstanding the Internal Revenue Service's announcement that it declined to follow Northern Natural Gas, Rev.Rul. 60–317, 1960–2 Cum.Bull. 452, the court believes the decision is correct. Factual distinctions between the cases do not require that *Northern Natural Gas* be rejected as authority.

The court concludes the taxpayers are entitled to depreciate easement costs over a period of thirty years in a straight line method for the years in question. The easements are used in the taxpayers' trade or business. The easements are definitely limited in duration. The thirty-year period is capable of estimation from experience with reasonable certainty. The estimation, of course, is not absolute, but for the purpose of depreciation it need not be. The allowance for depreciation is reasonable.

We turn now to allocation of the costs between the easement and the pipeline. The items in dispute are damages and clearing and grading. The allocation of other costs is not in dispute.

We will first consider the question of damages. The typical right-of-way agreement granted the taxpayers a fifty-foot easement for the construction, maintenance, and operation of an underground pipeline. The consideration recited in the agreement provides for the payment of one dollar for each rod of pipe plus payment of any damages that may arise from the construction, maintenance, operation, and removal of the lines. The agreement also provides that the taxpayers can secure additional easements for additional pipelines upon payment of the same consideration. The amounts which the taxpayers paid to the landowners for roddage have been allo-

302

cated to the easements and are not in issue.

Much of the land crossed by the easements was heavily wooded, and damages paid for timber represent a substantial proportion of the amount of total damages which are in issue. Damages ordinarily were determined after completion of construction. Additional damages were paid by Commonwealth when its original line was looped.

■ Analysis of the contracts and consideration of the evidence leads the court to conclude that the roddage fees were in the nature of payment for licenses to permit the taxpayers to obtain an easement. The roddage fees were uniform regardless of the value of the land. The larger payments in most instances were in the form of damages. Damages were really the payment of deferred purchase price determined after the landowner had an opportunity to see the consequences of his grant to the taxpayers. The court concludes that damages should be allocated to the cost of the easement and not to the pipeline itself.

The next item is clearing and grading. The amounts charged to clearing and grading represent the cost of clearing trees and other obstructions from the right of way so that the heavy equipment of the construction crews could move along the right of way. Grading was necessary for the movement of equipment and to reduce bending the pipe. The costs are included in the construction contract for the pipeline and represent a part of the contractor's charge.

The court finds that clearing and grading are integral parts of the pipeline construction. The pipeline could not be constructed without these operations. Initial clearing and grading of the original line was not of significant benefit to the construction of a loop line, and additional clearing and grading was required for the loop. Clearing and grading costs have only incidental value for maintenance and inspection.

There is very little authority on this point. The crucial question is one of fact. The court concludes clearing and grading costs should be allocated to the pipeline itself and not to the intangible easement.