H.A. TRUE, Jr.; Jean D. True; Henry A. True, III; Karen S. True; David L. True; Melanie A. True; Donald G. Hatten; Tamma T. Hatten; Diemer D. True; Susan L. True, Plaintiffs, Counter–Claim Defendants–Appellees, Cross–Appellants,

v.

UNITED STATES of America, Defendant, Counter–Claimant–Appellant, Cross–Appellee.

Nos. 86–2451, 86–2617.

United States Court of Appeals, Tenth Circuit.

Jan. 29, 1990.

**1198**

David M. Moore, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Roger M. Ol-sen, Asst. Atty. Gen., Michael L. Paup, Jonathan S. Cohen, and Francis M. Allegra, Attys., Tax Div., Dept. of Justice, Washington, D.C., and Richard Allen Stacy, U.S. Atty., Cheyenne, Wyo., of counsel, with him on the briefs), for defendant, counter-claimant-appellant, cross-appellee.

Claude M. Maer, Jr. of Baker & Hostetler, Denver, Colo. (Fred M. Winner of Baker & Hostetler, Denver, Colo., Richard E. Day of Williams, Porter, Day & Neville, and R. Stanley Lowe and Ronald M. Morris of Casper, Wyo., with him on the briefs), for plaintiffs, counter-claim defendants-appellees, cross-appellants.

Before SEYMOUR, MOORE and BALDOCK, Circuit Judges.

SEYMOUR, Circuit Judge.

Plaintiff taxpayers, a husband, wife, and their four adult children and spouses, were owners of True Oil Company, a general partnership organized under Wyoming's Uniform Partnership Act, and the sole shareholders of Belle Fourche Pipeline Company, an electing corporation under subchapter S of the Internal Revenue Code, 26 U.S.C. § 1361.[1] Plaintiffs brought five suits seeking income tax refunds for the taxable years 1973 through 1975. The actions were consolidated and the numerous issues variously decided by summary judgment, by directed verdict, and in a jury trial. The district court entered judgment for plaintiffs awarding them income tax refunds plus interest. *True v. United States*, 603 F.Supp. 1370 (D.Wyo.1985). The Government has appealed. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.[2]

**I.**

The Government first appeals the district court's holding that Belle Fourche's

---

1. Unless otherwise indicated, citations to the Internal Revenue Code refer to the official version of the United States Code, 1970 Edition.

2. While under submission in this court, plaintiffs and the Government settled the disputes in plaintiffs' cross-appeal and the Government's appeal concerning plaintiffs' entitlement to additional investment tax credit carrybacks and carryovers. These issues were withdrawn by stipulation.

surface damage payments to landowners constituted a pipeline construction cost, rather than a cost of acquiring the easements. The facts underlying this issue are not in dispute. Belle Fourche purchased easements from various landowners from 1973 through 1975 to build oil pipelines. Under Belle Fourche's typical "Right-of-Way Contract," the landowner "warrant[ed] and convey[ed]" to it the right to "construct, maintain, inspect, operate, protect, repair, replace ... or remove" a pipeline. *See, e.g.,* rec., vol. I, doc. 94, exh. C. In return, Belle Fourche agreed to pay the landowners a "roddage fee" (a sum based on the length of the right of way obtained), and "to pay any damages which may arise to growing crops, pasturage, fences, or buildings of said Grantors from the exercise of the rights herein granted...." *Id.* In contemporaneously executed release agreements, the landowners received a specific payment in exchange for their release of Belle Fourche from the liability it assumed under the easement agreement for any damages caused by pipeline construction. The "roddage fees" and damage payments were separately negotiated, but Belle Fourche usually paid both amounts by a single draft or check. Belle Fourche made damage payments totalling $123,494.59 during the taxable years in question.

Whether the damage payments are labeled pipeline construction costs or easement acquisition costs is important because I.R.C. § 38 permits taxpayers to earn tax credit for investments in certain tangible property, but not for intangible property.[3] There is no dispute that oil and gas pipelines are considered tangible property and so are eligible for the tax credits, while pipeline easements are considered intangible property and therefore ineligible. Belle Fourche sought to claim investment credits for the damage payments it made, but these claims were denied by the Commissioner of Internal Revenue.

The courts are divided on whether surface damage payments should be characterized as costs of easement acquisition or costs of pipeline construction. Two courts have held them to be part of the cost of the easement. Both courts reasoned that the obligation to pay for surface damages was part of the easement acquisition agreement and thus was part of the acquisition cost. In *Commonwealth Natural Gas Corp. v. United States,* 266 F.Supp. 298, 302 (E.D. Va.1966), *aff'd on other grounds,* 395 F.2d 493 (4th Cir.1968), the court concluded that the surface damage payments were easement acquisition costs because the "[d]amages were really the payment of deferred purchase price determined after the landowner had an opportunity to see the consequences of his grant to the taxpayers."[4] The Fifth Circuit also found the damage payments to be acquisition costs, reasoning that "the key lies in the fact that the damage amounts are paid to the landowner for utilization of the contractual easement." *Tenneco, Inc. v. United States,* 433 F.2d 1345, 1349 (5th Cir.1970) (emphasis omitted).[5] The court observed that "the obligation to pay such amounts is incurred in the easement contract" and that the damages incurred "result from utilization of the easement for which taxpayers contracted." *Id.* Naturally, the Government urges us to follow these decisions.[6]

---

3. See also I.R.C. § 46(a) & (c), which set forth the method for determining the amount of the investment credit, I.R.C. § 48(a)(1)(B)(i), which defines property eligible for section 38 treatment, and implementing Treasury Department regulations §§ 1.48–1(d)(3) & (4) and 1.48–1(f). 26 C.F.R. §§ 1.48–1(d)(3) & (4), & § 1.48–1(f) (1973).

4. The right-of-way agreements in *Commonwealth Natural Gas,* like the agreements here, conveyed an easement and provided for the payment of damages caused by pipeline construction, maintenance, etc., in addition to the "roddage fee." The damage payments, however,

"ordinarily were determined after completion of construction." 266 F.Supp. at 302.

5. The easement contracts in *Tenneco* also required the payment of "roddage fees" and the payment of damages resulting from use of the easements. The damage payments normally were made at the time of construction, but sometimes were estimated and paid in advance. 433 F.2d at 1346.

6. The Government also argues that this court's decision in *Gilbertz v. United States,* 808 F.2d 1374 (10th Cir.1987), supports its position. One issue in *Gilbertz* was whether payments *received*

Plaintiffs just as naturally invoke *Mapco, Inc. v. United States*, 556 F.2d 1107, 214 Ct.Cl. 389 (1977), which held that surface damage payments are attributable to the costs of pipeline construction.[7] The court noted that the purchase of an easement and the payment of compensation for surface damages usually are "entirely separate transaction[s]—and [are] chronologically removed" from one another. *Id.* 556 F.2d at 1114. The court also focused on the fact that the easement vests in the pipeline company at the time the easement contract is executed, and is in no way contingent on actual construction of the pipeline. Moreover, the court emphasized that the pipeline company "becomes obligated to pay the landowner ... for the damages occasioned by the construction" only if and when the easement is actually used. *Id.*

We join the courts in *Commonwealth Natural Gas* and *Tenneco* and conclude that attributing surface damage payments to the cost of acquiring an easement is the sounder conceptual approach. In *Mapco*, in the above cases, and in this case, the easement agreement itself created the easement holder's obligation to pay for surface damages. In addition, the agreement recited that this obligation constitutes a part of the consideration given to acquire the easement. The occurrence of damages leading to a payment of money in no way altered the obligation. It was merely the occurrence of a contingency creating in the landowners the right to demand performance under the obligation.

In the present case, the landowners sold their rights to compensation for surface damages they had obtained under the easement agreement in a release in lieu of collecting damages as they occurred. In both situations the payments were premised on the same underlying obligation to pay for surface damages, an obligation which the easement holder assumed in the easement agreement.[8] The crucial deter-

---

*by a landowner* from pipeline companies in exchange for a release of the easement holder's liability for surface damages it agreed to assume in the easement contract were taxable income or nontaxable recovery of basis. We held that since payment was to compensate for permanent damage to land, the income represented by the payments was a return of capital constituting a recovery of basis. *Id.* at 1382.

Although *Gilbertz* involved the same type of transactions at issue in the present case, we do not find *Gilbertz* persuasive in deciding the separate issue of whether the payments as expenditures are a cost of pipeline construction or a cost of acquisition of an easement. The operative fact in *Gilbertz* was the permanent damage to the taxpayer/seller's grasslands, compensation for which would be a return of capital analogous to a sale of a capital asset. *Cf. Raytheon Prod. Corp. v. Commissioner,* 144 F.2d 110, 113 (1st Cir.1944) (test for treating damages as return of capital or ordinary income is to ask "[i]n lieu of what were the damages awarded"), *cert. denied* 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622 (1944) (cited in *Gilbertz* at 1381). But such reasoning does not imply necessarily that the corresponding expenditure amounts to a purchase of an interest in that land. For example, if an adjoining landowner's malfeasance caused permanent damage to her neighbor's land, the resulting income to compensate the landowner would be a return of capital analogous to a sale under the *Gilbertz* rule. But the tortfeasor's corresponding expenditure obviously does not *ipso facto* represent the purchase of an interest in her neighbor's land.

7. The easement agreements in *Mapco,* like those in *Commonwealth Natural Gas, Tenneco,* and the instant case, obligated the pipeline company to pay a roddage fee, and to pay for damages arising from the construction, maintenance, etc. of the pipelines. *See Mapco,* 556 F.2d at 1112–13. But the pipeline company in *Mapco,* unlike the plaintiffs in this case, never executed a release agreement and merely paid damages as they occurred during construction in accordance with the easement agreement. *Id.* at 1113.

8. Absent the clause in the conveyance making the easement holder responsible for surface damages, Wyoming law apparently would put such damages on the landholder's shoulders, provided they were incident or necessary to the easement's proper enjoyment. *See WYMO Fuels, Inc. v. Edwards,* 723 P.2d 1230, 1236 (Wyo. 1986) (rights of the owner of the easement are paramount to the extent of the easement and include all rights incident or necessary to its proper enjoyment). Belle Fourche would be liable only for surface damages created by *unreasonable* use of the easement granted. *See Bard Ranch Co. v. Weber,* 557 P.2d 722, 730–31 (Wyo.1976) ("[right of way] 'may be used in such a manner as is necessary in the proper and reasonable occupation of the dominant estate'") (quoting *Cameron v. Barton,* 272 S.W.2d 40, 41 (Ky.1954)).

Plaintiffs and the *Mapco* court attempt to distinguish between acquisition of the easement and exercise of the rights granted under the easement. This distinction ignores the fact that under Wyoming law the easement conveyance

mination is whether the parties created the *obligation* to pay as part of the conveyance. It is only the determination of the precise quantum of damages that is left for subsequent events, be it pipeline construction or settlement by means of a release agreement.

As part of the consideration offered to obtain the easement, the surface damage payments are part of the costs of its acquisition. We conclude that the district court's reliance on *Mapco* is misplaced and hold that it erred when it concluded that Belle Fourche's surface damage payments to various landowners were part of the cost of construction.[9] Consequently, we reverse this portion of the district court's order.

## II.

The Government also appeals the district court's finding that Belle Fourche could deduct a civil penalty it paid. The facts relating to this issue are not in dispute. Belle Fourche paid a civil penalty in the amount of $1,200.00 during the fiscal year ending March 31, 1975. The penalty, assessed under section 311(b)(6) of the Federal Water Pollution Control Act ("FWPCA" or "Act"), 33 U.S.C. § 1321(b)(6) (Supp. II 1972),[10] was imposed because oil leaked from some of Belle Fourche's pipelines in violation of section 311(b)(3) of the Act, 33 U.S.C. § 1321(b)(3).[11] Belle Fourche deducted this payment under I.R.C. § 162(a), but the Commissioner disallowed the deduction under the exception for any "fine or similar penalty" in section 162(f) of the Code, 26 U.S.C. § 162(f), and Treasury Regulation section 1.162–21 (1975).

■ Code section 162(a) permits deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 162(f) excepts from this general rule "any fine or similar penalty paid to a government for the violation of any law." Treasury Regulation section 1.162–21, implementing section 162(f), defines the statutory language "fine or sim-

---

itself provides for a distribution of burdens and benefits incident to its exercise.

**9.** A holding that surface damage payments as defined in this case are "costs of construction" could create results directly contrary to the statutory and regulatory investment tax credit scheme. For example, the payment for the release in the instant case applies to obligations for damages created from "exercise of the rights herein granted." Those rights are not only to "construct" pipelines but also to "maintain, *operate*, protect, *repair*, replace or *remove*" a pipeline. Rec., vol. I, doc. 94, exh. C (emphasis added). Only the most expanded definition of a construction cost would include damages arising from pipeline *"removal."* Yet allowing the investment credit for the release payments would include this amount.

Similarly, I.R.C. § 46(c) (1970), defines the "qualified investments" subject to the credit as a percentage of *basis* or *cost.* Thus the Code contemplates that the credit relates to the acquisition of used or new property. The damage payments at issue here apply much more broadly, however, to the *operation, maintenance, repair,* and *removal* of pipelines. We do not believe that such expenditures are properly within the ambit of an *investment* tax credit.

**10.** At the time of the oil discharge in this case, section 311(b)(6) read:

"Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary. The Secretary of the Treasury shall withhold at the request of such Secretary the clearance required by section 91 of Title 46 of any vessel the owner or operator of which is subject to the foregoing penalty. Clearance may be granted in such cases upon the filing of a bond or other surety satisfactory to such Secretary."

**11.** This section was amended by the Clean Water Act of 1977, Pub.L. No. 95–217, 91 Stat. 1566, the Federal Water Pollution Control Act Amendments of 1978, Pub.L. No. 95–576, 92 Stat. 2168; but these amendments have no bearing on this case.

ilar penalty" to include moneys "[p]aid as a civil penalty imposed by Federal, State, or local law." Treas.Reg. § 1.162–21(b)(1)(ii).[12] The regulation provides several examples of civil penalties not deductible under section 162(f), including one which both parties acknowledge is dispositive of the issue before this court:

"A civil penalty under 33 U.S.C. 1321(b)(6) of $5,000 was assessed against N Corp. with respect to the discharge [of oil in violation of 33 U.S.C. § 1321(b)(3)]. N Corp paid $5,000 to the Coast Guard in payment of the civil penalty. Section 162(f) precludes N Corp. from deducting the $5,000 penalty."

Treas.Reg. § 1.162–21(c)(2).[13] If this regulation is valid, we must reverse the district court's holding that the civil penalty assessed against Belle Fourche pursuant to section 311(b)(6) is not a "fine or similar penalty" within the meaning of section 162(f).

The court's role in reviewing Treasury Department regulations is very limited.

"Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 27 U.S.C. § 7805(a). In this area of limitless factual variations 'it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments.' The rule [sic] of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congres-

sional mandate in some reasonable manner."

*United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967) (citation omitted). As a general rule, Treasury regulations " 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.' " *United Telecommunications, Inc. v. Commissioner,* 589 F.2d 1383, 1387 (10th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2839, 61 L.Ed.2d 284 (1979).

"In determining whether a particular regulation carries out the congressional mandate in a proper manner, [courts] look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). Accordingly, we first analyze the scope of section 162(f).

Just what Congress intended by the words "fine or similar penalty" in section 162(f) is not immediately obvious. A common sense reading indicates to us that the addition of the words "similar penalty" reflects an intent to include more than just criminal fines, but not all penalties. The section's legislative history bears out this reading of the section's plain language.

The history of section 162(f)'s enactment in the Tax Reform Act of 1969 § 902(a), Pub.L. No. 91–172, 83 Stat. 711 (codified at I.R.C. § 162(f)), reveals that Congress intended to codify the "general court position" disallowing the deduction of fines and penalties.[14] At the time, the Supreme

---

12. The Treasury Department first proposed section 1.162–21 in 1971, 36 Fed.Reg. 9637–40, 9638–39 (1971), and adopted it (with certain revisions) in 1972, 37 Fed.Reg. 23916 (1972). Before the year was over, however, proposed amendments to section 1.162–21 were noticed. 37 Fed.Reg. 25937–939, 25938 (1972). Section 1.162–21, as amended and revised, was finalized in 1975, except for paragraphs (b)(1)(ii) and (b)(2), which were again noticed as proposed, 40 Fed.Reg. 7437 (1975). The newly proposed paragraphs (b)(1)(ii) and (2) were finalized without change four months later. 40 Fed.Reg. 29,290 (1975). Throughout all these changes, the definition of a "fine or similar penalty" to include amounts paid as civil penalties has remained unchanged.

13. At the time the regulations were first proposed, the section 311(b)(6) example quoted in the text was not included. *See* 36 Fed.Reg. 9637–40, 9639 (1971). The proposed amendment to section 1.162–21 in 1972, however, included an example based on 33 U.S.C. § 1161, the statutory predecessor of section 311(b)(6). *See* 37 Fed.Reg. 25937–939, 25938 (1972). The 1975 finalization of section 1.162–21 incorporated the example based on section 311(b)(6) currently found there. *See* 40 Fed.Reg. 7437–40, 7439 (1975).

14. The Senate Finance Committee Report commented that

"the committee amendments provide that no deduction is to be allowed for any fine or

Court had declared in two cases concerning fines under penal statutes that no deduction was allowable for a fine or penalty if allowing the deduction would severely frustrate a sharply defined national policy. *See Tank Truck Rentals v. Commissioner*, 356 U.S. 30, 35, 78 S.Ct. 507, 510, 2 L.Ed.2d 562 (1958) (test of nondeductibility is severity and immediacy of policy frustration from allowance of deduction); *Hoover Express Co. v. United States*, 356 U.S. 38, 40, 78 S.Ct. 511, 512, 2 L.Ed.2d 568 (1958) (fine for violation of strict liability maximum weight statute held not deductible). This rule was also applied to civil penalties. *See, e.g., A.D. Juilliard & Co., Inc. v. Johnson*, 259 F.2d 837, 844 (2d Cir.1958) (treble damages for Emergency Price Control Act civil penalty not deductible), *cert. denied*, 359 U.S. 942, 79 S.Ct. 723, 3 L.Ed.2d 676 (1959); *McGraw–Edison Co. v. United States*, 300 F.2d 453, 456, 156 Ct.Cl. 590 (1962) (no deduction for payment to U.S. in settlement of breach of agreement providing "penalty" for employing child labor); *Tunnel Ry. of St. Louis v. Commissioner*, 61 F.2d 166, 174–75 (8th Cir.1932) (civil penalties under Safety Appliance Act not deductible), *cert. denied*, 288 U.S. 604, 53 S.Ct. 396, 77 L.Ed. 979 (1933).

In 1971, two years after the enactment of section 162(f), the IRS issued its proposed regulations which, consistent with the extant case law, defined "fine or similar penalty" to include civil penalties. *See* 36 Fed.Reg. 9637–39 (May 27, 1971). That same year, proposed amendments to section 162 were considered as part of the Revenue Act of 1971. Section 162(f) remained untouched, although the Senate Finance Committee responded to questions concerning the proposed regualtions and took the opportunity to clarify the meaning of a "fine or similar penalty":

> "In approving the provisions dealing with fines and similar penalties in 1969, it was the intention of the committee to disallow deductions for payments of sanctions which are imposed under civil statutes but which in general terms serve the same purpose as a fine exacted under a criminal statute."

S.Rep. No. 437, 92nd Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Admin. News 1918, 1980. The Committee tried to illustrate its point with examples:

> "The provision was intended to apply, for example, to penalties provided for under the Internal Revenue Code in the form of ... assessable penalties (subchapter B of chapter 68) as well as to additions to tax under the internal revenue laws (subchapter A of chapter 68) in these cases where the government has the fraud burden of proof.... It was also intended that this rule should apply to similar type payments under the laws of a state or other jurisdiction.
>
> "On the other hand, it was not intended that deductions be denied in the case of sanctions imposed to encourage prompt compliance with requirements of law. Thus, many jurisdictions impose 'penalties' to encourage prompt compliance with filing or other requirements which are really more in the nature of late filing charges or interest charges than they are fines.... [I]n this area, the committee did not intend to liberalize the law in the case of fines and penalties.

similar penalty paid to a government for the violation of any law. This provision is to apply to any case in which the taxpayer is required to pay a fine because he is convicted of a crime (felony or misdemeanor) in a full criminal proceeding in an appropriate court. This represents a codification of the *general court position* in this respect."
S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Admin.News 2027, 2311–12 (emphasis added).

Although this language deals expressly only with the disallowance of criminal fines, courts have interpreted the reference to the "general court position" to mean that the disallowance of civil penalties was intended as well. *See, e.g., Colt Indus., Inc. v. United States*, 880 F.2d 1311, 1313 (Fed.Cir.1989) (section 162(f) codified case law disallowing deductions for civil penalties); *Adolf Meller Co. v. United States*, 600 F.2d 1360, 1362, 220 Ct.Cl. 500 (1979). *See also Mason & Dixon Lines, Inc. v. United States*, 708 F.2d 1043,

*Id.*[15]

■ These comments, along with the prior case law which the 1969 report incorporated, indicate that section 162(f) encompasses fines and penalties exacted to sanction or punish conduct which some well-defined state policy seeks to proscribe.[16] Whether the statute is determined to be "criminal" or "civil" is not conclusive. Rather, the nondeductibility exception for "fines and similar penalties" includes criminal fines and any similar retributive civil penalty intended to sanction conduct the state specifically seeks to prohibit. It follows implicitly that compensatory or remedial payments are beyond the scope of section 162(f). In addition, civil penalties for the violation of reporting requirements, filing deadlines, and other procedural failings which do not frustrate the primary purpose of the statutory scheme also remain deductible.

Having determined the intent and scope of section 162(f), our next task is to determine whether Treasury Regulation section 1.162–21(b)(1)(ii), defining "fine or similar penalty," and the specific example provided in Treasury Regulation section 1.162–21(c)(2), are "unreasonable and plainly inconsistent" with section 162(f). *See United Telecommunications*, 589 F.2d at 1387. Plaintiffs argue that the regulation is invalid because it necessarily includes *all* civil penalties, not just the "similar" penalties contemplated in section 162(f). Taken literally and in isolation, we agree with plaintiffs that the regulation could be so interpreted. But plaintiffs ignore the exception in Treasury Regulation section 1.162–21(b)(4)[17] which provides that "[c]ompensatory damages ... paid to a government do not constitute a fine or penalty." Thus, the regulation is consistent with the statute since civil sanctions compensatory in nature remain deductible.[18] We therefore conclude that section 1.162–21(b)(2), properly construed, is reasonable and consistent with the statute.[19]

■ The question remains whether the dispositive example of a "fine or similar penalty" in the regulation concerning the same civil penalty at issue in this case, *see* Treas.Reg. § 1.162–21(c)(2), is "unreasonable and plainly inconsistent" with section 162(f). Plaintiffs argue that the example is inconsistent with section 162(f) because it is primarily compensatory rather than punitive. While the district court did not discuss the impact of the Treasury Regulation, it agreed with plaintiffs and concluded that the civil penalty in section 311(b)(6), 33 U.S.C. § 1321(b)(6) (Supp. II 1972), is primarily remedial and compensatory and

1046 (6th Cir.1983); *Southern Pac. Transp. Co. v. Commissioner,* 75 T.C. 497, 652 (1980).

**15.** We rely on subsequent legislative history in construing section 162(f) for several reasons. First, the section was reenacted without change in 1971 by substantially the same Senate Finance Committee that had proposed it in 1969 (only two of sixteen members had changed). Second, the Committee's subsequent statement is consistent with its stated intention in 1969 to adopt the "general court position" in this area.

**16.** Plaintiffs suggest that the Committee's language, disallowing deductions where the "sanctions ... in general terms serve the same purpose as a fine exacted under a criminal statute," S.Rep. No. 437, 1971 U.S.Code Cong. & Admin. News at 1980, should be the litmus test for defining the scope of section 162(f). *See also Southern Pac. Transp. Co.,* 75 T.C. at 653. While we agree that this language is helpful, we think the better approach is to consider all the legislative materials, read together with the preexisting case law which section 162(f) was intended to codify.

**17.** Currently section 1.162–21(b)(2).

**18.** The regulatory definition of "fine or similar penalty" could perhaps be interpreted to include the procedural violations Congress had intended to exclude from section 162(f). But because the penalty assessed against plaintiffs in this case is not even remotely similar to a payment resulting from the type of procedural infraction specifically excluded by the Finance Committee we do not need to address this issue.

**19.** The court in *Adolf Meller Co.,* 600 F.2d at 1363, also rebuffed an attack on the validity of the definition of "fine or similar penalty." The court there upheld Treasury Regulation section 1.162–21(1)(b)(iii), which included amounts paid in settlement of actual or potential liability for a civil or criminal penalty. As we have done in this case, the *Meller* court construed the regulation in light of the legislative history of the statute it implements. *Id.* at 1362–64.

therefore beyond the scope of section 162(f). In its opinion, the district court relied on the statute's strict liability standard and the Government's use of the proceeds to pay for administering the Act and financing oil cleanup. *True,* 603 F.Supp. at 1374.

If the civil penalty in section 311(b)(6) is primarily compensatory, then it is "plainly inconsistent" with section 162(f), and thus would invalidate the regulatory example. But we cannot accept the district court's conclusion that the civil penalty in section 311(b)(6) is essentially compensatory. Although the civil penalty in the FWPCA employs a strict liability standard, the legislative history of section 162(f) reflects that some penalties for violations of strict liability statutes may be nondeductible. In *Hoover Motor Express Co.,* for example, the Supreme Court concluded that a fine paid for violation of a state maximum weight requirement was not deductible "[e]ven assuming that petitioner acted with all due care and without willful intent." 356 U.S. at 40, 78 S.Ct. at 512. The Court's discussion in *Hoover* illustrates that no necessary relationship exists between strict liability and a compensatory scheme. Moreover, the Court's decision in *Hoover* comprised part of the "general court position" to which the Senate Finance Committee referred in discussing section 162(f). We therefore cannot say that the strict liability standard makes the section 311(b)(6) penalty "plainly inconsistent" with section 162(f). Rather, the legislative history indicates that Congress intended to incorporate the judicial view that some strict liability penalties are nondeductible.

The district court also relied on several cases characterizing the FWPCA as a compensatory scheme to shift the costs of pollution from the public to the pollutors. *See, e.g., United States v. Ward,* 448 U.S. 242, 249, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980) (holding section 311(b)(6) penal-

ties not sufficiently "criminal" to attract constitutional procedural safeguards for criminal defendants); *United States v. Marathon Pipe Line Co.,* 589 F.2d 1305, 1309 (7th Cir.1978) (application of strict liability standard to section 311(b)(6) penalties does not violate substantive due process); *United States v. Tex–Tow, Inc.,* 589 F.2d 1310, 1315 (7th Cir.1978) (same).

The Supreme Court's holding in *Ward* is of little consequence in the present case, since section 162(f) undisputably applies both to civil and criminal penalties. We also believe that the district court ascribed undue importance to dicta in a concurrence by two Justices in *Ward,* concerning constitutional criminal procedure, to determine the Supreme Court's hypothetical view on an unrelated tax law question.

We agree with the conclusion in *Marathon* and *Tex–Tow,* the other cases the district court cited, that a purpose of section 311(b)(6) *could* be compensatory and remedial. *Cf. Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (rational relation between actual evil and conceivable legislative purpose in addressing it enough to validate economic legislation under due process clause). In fact, employment of the proceeds from section 311(b)(6) to administer the Act and to finance cleanup costs actually does serve a remedial purpose. These facts, when viewed in context, do not suffice to justify a conclusion that the section 311(b)(6) example in the Treasury regulations is "plainly inconsistent" with the "fines and similar penalties" clause in section 162(f). To the contrary, the civil penalty in section 311(b)(6) strikes us on balance as serving a deterrent and retributive function similar to a criminal fine. For example, the maximum penalty for a particular violation of five thousand dollars has no bearing on the cleanup costs incurred by the Government or the amount of damage caused.[20] Instead, a wholly independent provision in the

---

**20.** Coast Guard policy for applying civil penalties in section 311(b)(6) of the FWPCA states that the amount of the penalty is "entirely unrelated to the subsequent removal responsibility for which the discharger must bear the expense.... In no case may a responsible party avoid or reduce a civil penalty by removing the discharged oil." *United States v. LeBeouf Bros. Towing Co.,* 377 F.Supp. 558, 569–70 (E.D.La. 1974), *rev'd on other grounds,* 537 F.2d 149 (5th Cir.1976), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1688, 52 L.Ed.2d 383 (1977).

Act authorizing the Government to recoup costs incurred in oil cleanup operations appears to be the primary compensatory or remedial mechanism in the FWPCA. *See* 33 U.S.C. § 1321(f). The penalty in section 311(b)(6) consequently must serve as an *additional* sanction to deter and punish, not to compensate or remedy.

Moreover, section 311(b)(6) requires that the Coast Guard consider three factors in determining the size of the penalty: "the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation". 33 U.S.C. § 1321(b)(6) (Supp. II 1972). Only the last factor arguably relates to the amount of damage caused, but even that factor could relate as plausibly to the degree of fault of the party charged.[21] The first two factors unambiguously concern the degree of retributive impact on the violator.

Finally, the civil penalty in section 311(b)(6) sanctions conduct or consequences therefrom comprising the primary evil the FWPCA was enacted to prevent: water pollution. Section 311(b)(1) "declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States." 33 U.S.C. § 1321(b)(1). This is an urgent and sharply defined national policy.

Far from being "'unreasonable and plainly inconsistent with the revenue statutes,'" *United Telecommunications, Inc.*, 589 F.2d at 1387, *quoting Fulman v. United States*, 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978), we conclude that the section 311(b)(6) example in Treasury Regulation § 1.162(c)(2) is fully consistent with the "fines and similar penalties" clause in section 162(f). The regulation is therefore valid and, accordingly, we reverse the district court's conclusion that the penalty is deductible under section 162(a) of the Code.

### III.

The next issue is whether gas processing machinery relocation costs are depreciable capital investments when undertaken as part of a "'general plan' of rehabilitation, modernization, and improvement." *See United States v. Wehrli*, 400 F.2d 686, 689 (10th Cir.1968).[22] Although

**21.** Coast Guard policy as of 1973 provided:
"A number of considerations may be made in determining the gravity of a violation, such as the degree of culpability associated with the violation, the prior record of the responsible party, and the amount of oil discharged. Substantial intentional discharges should result in serve penalties, as should cases of gross negligence, and so on."
*LeBeouf Bros.*, 377 F.Supp. at 569.

**22.** The Government also appeals the district court's denial of its directed verdict motion, in which it contended that plaintiffs' machinery repair and moving costs were a capital investment because they caused the assets to increase substantially in value. In reviewing the denial, this court must determine "whether the evidence is sufficient to create an issue for the jury," viewing the evidence in the light most favorable to the nonmoving party. *Black v. Hieb's Enterprises, Inc.*, 805 F.2d 360, 364 (10th Cir.1986) (quoting *Wren v. Spurlock*, 798 F.2d 1313, 1317 (10th Cir.1986)). After reviewing the record, we conclude that the district court properly denied the motion for a directed verdict. Both sides presented testimony concerning Quinton Darnell's valuations of the gas processing system before and after the move. The Government points to the huge increase in value in Darnell's second valuation after the move. The taxpayer emphasizes Darnell's testimony that the increase was due largely to the different methods of valuation used. Taken in the light most favorable to plaintiffs (the nonmoving parties), a factual issue over the correct valuation exists. Consequently, the district court properly sent the issue to the jury.

In addition, the Government argues that the district court improperly allowed, over the Government's objection, expert testimony for plaintiffs on the valuation of the machinery and other items. In essence, the Government claims it was unfairly surprised because Cloyd Harris, plaintiffs' accountant, gave expert testimony on the gas machinery relocation and renovation issues when he was identified as a *fact* witness, but not as an *expert* witness. The Government was incurably prejudiced, it argues, because it was not prepared to call its own expert to testify.

The district court found that the Government could not have been unfairly surprised when the Government (1) knew that the witness was plaintiffs' accountant and had prepared the returns at issue, (2) had deposed the witness, (3) was advised that the witness would testify as to his preparation of the returns in plaintiffs' pretrial memorandum, and (4) had named the wit-

many relevant facts are disputed, plaintiffs and the Government appear to agree that in the 1960s, True Oil Co. owned a forty-nine percent interest in a gas processing plant at the Coyote Creek field in Wyoming. This plant eventually became uneconomical to operate because continued gas extraction would have harmed the oil deposits there. In 1973, True Oil purchased the remaining fifty-one percent interest in the gas plant for $125,000. True Oil ceased operating the plant, dismantled it, and moved it to another field it had recently obtained at Red Wing Creek, North Dakota. At Red Wing Creek, True Oil reconstructed the plant and, during the dismantling, moving, and reconstruction process, repaired and overhauled the plant. True Oil spent approximately $870,000 on these activities, of which $124,000 was for repair costs and $327,000 was for moving expenses. The remainder was undisputedly capital investment.

Plaintiffs deducted the repair and machinery moving expenses in their 1973 and 1974 tax returns as ordinary and necessary business expenses under section 162(a) of the Code. The Government took issue with this characterization. In plaintiffs' refund suit in the district court, the Government sought a jury instruction that both repair and moving costs constitute a nondeductible capital investment if incurred as part of a general plan of rehabilitation, modernization, and improvement of the property. The district court rejected the proffered instruction as to the machinery moving expenses, ruling that our decision in *Wehrli* applied to repair expenses only.[23] The jury then found that True Oil Company's machinery moving expenses were currently deductible.

The Government claims that the jury instruction was erroneous because our decision in *Wehrli* should apply to machinery relocation costs as well as to repair expenses. Plaintiffs contend that our approach in *Wehrli* has no bearing on moving costs, and that such costs are deductible as ordinary business expenses regardless of whether they are incurred as part of a "general plan."

In *Wehrli*, the taxpayer paid for extensive repairs, renovation, and remodeling of his office building to accommodate a new tenant. The taxpayer capitalized the air conditioning installation, steel reinforcement columns, exterior doors and partition walls. He deducted the cost of much of the remaining work as a business expense, such as replacement of the floors' electrical fixtures, plumbing fixtures, and the painting and plastering of the walls. 400 F.2d at 688. The Government claimed that most of the repairs deducted as "incidental repairs" were depreciable capital expenditures in that factual context.

In our decision in *Wehrli*, we recognized that many of the repairs standing alone could be labeled "incidental" and therefore currently deductible. *See* Treas.Reg. § 1.162–4. But where the repairs occur as part of a " 'general plan' of rehabilitation, modernization, and improvement of the property," their character and effect assumes that of the larger enterprise of which they are a part. *Wehrli*, 400 F.2d at 689. We held that:

> "[w]hether the plan exists, and whether a particular item is part of it, are usually questions of fact to be determined by the fact finder based upon a realistic appraisal of all the surrounding facts and circumstances, including, but not limited to, the purpose, nature, extent, and value of the work done, e.g., whether ... [it was done] to adopt the property to a different use or in any event, whether what was done resulted in an appreciable enhancement of the property's value."

---

ness as a possible adverse fact witness. After reviewing the record and considering all the circumstances of the proceedings below, we hold that the district court did not abuse its discretion in allowing Cloyd Harris to testify as an expert. *See Smith v. Ford Motor Co.,* 626 F.2d 784, 797–800 (10th Cir.1980) (listing factors to be considered in determining whether trial court abused its "wide" discretion in pretrial and discovery matters).

**23.** The jury was instructed that it could find that any moving expense was a capital expenditure if it materially increased the value of the plant, appreciably prolonged the useful life of the plant, or adapted the plant to a different use. It is the jury's failure to receive the additional, "general plan" instruction, that is being contested here.

*Id.* at 690. We then remanded the case for a jury determination under this standard.

Plaintiffs would have us hold that the *Wehrli* rule was meant to apply to repair expenditures only. Plaintiffs are correct that the facts in *Wehrli* required that we analyze the statutes and regulations relevant to the characterization problem only in the context of the tax treatment of repairs. Indeed, we traced the repair regulation, *see* Treas.Reg. § 1.162–4 (1975), back to its landmark interpretation in *Illinois Merchants Trust Co.*, 4 B.T.A. 103, 1926 WL 308 (1926). We recognized that "[t]he regulation, as thus approved [in *Illinois Merchants Trust*], is ... the prevailing guideline for the judicial function of determining whether ... an expenditure on property is deductible as a current repair expense or must be capitalized." 400 F.2d at 689. For this reason, the "general plan" analysis was "superimposed upon the criteria in the repair regulation" in *Wehrli.*[24] *Id.*

It is also true that the concept of a "general plan," operating to capitalize an otherwise deductible expense, developed in a line of early tax cases concerning repairs. In *I.M. Cowell v. Commissioner*, 18 B.T.A. 997, 1002, 1930 WL 802 (1930), the rule was first enunciated as follows:

> "To fix a door or patch plaster might very well be treated as an expense when it is an incidental minor item arising in the use of the property in carrying on business, and yet, as here, be properly capitalized when involved in a greater plan of rehabilitation, enlargement and improvement of the entire property."

Later cases have applied the rule in similar contexts. *See, e.g., Mountain Fuel Supply Co. v. United States*, 449 F.2d 816 (10th Cir.1971) (reconditioning of a portion of taxpayer's gas pipeline system); *Stoeltzing v. Commissioner*, 266 F.2d 374 (3d Cir.1959) (renovation of decrepit building where attempted deductions exceeded cost by almost 200 percent); *Jones v. Commissioner*, 242 F.2d 616 (5th Cir.1957) (renovation of an extremely deteriorated historical building to restore it to commercial usefulness); *Cox v. Commissioner*, 17 T.C. 1287 (1952) (restoration of warehouse to useable condition).

But plaintiffs are mistaken in their contention that the *Wehrli* analysis therefore should not apply to moving expenses, or to any expense the classification of which is not already clearly mandated in the Internal Revenue Code, the regulations, or in the case law. The Code does not contain any special rules concerning the treatment of machinery transport costs. Code section 162(a) allows deduction of ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. But "no deduction shall be allowed for [a]ny amount paid out for ... permanent improvements or betterments made to increase the value of any property or estate." 26 U.S.C. § 263(a)(1) (1970). The regulations give little more explanation.[25] In the case of machinery moving expenditures, it is thus left to the courts to provide proper guidance.

The purpose of capitalizing an expenditure is to ensure that the taxpayer accounts for expenses in such a way as to reflect taxable income accurately.[26] Courts have struggled unsuccessfully to construct a classification method that is simple yet consistent with this purpose. For example,

---

**24.** Contrary to plaintiffs' contention, the court in *Moss v. Commissioner*, 831 F.2d 833 (9th Cir.1987), did not understand the plan of rehabilitation doctrine to apply to repair expenses only. The court merely noted that the doctrine had developed in the repair expense context, and could apply to the repairs at issue in that case. *Id.* The scope of the *Wehrli* rule was not at issue in *Moss.*

**25.** Treasury Regulation section 1.162–1 merely paraphrases the statute: "[b]usiness expenses ... include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business." No reference is made to machinery moving expenses. Treasury Regulation section 1.263(a)–1(b) states that "[i]n general, [capital expenditures] ... include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use." No reference is made to machinery moving expenditures.

**26.** The Internal Revenue Code requires the taxpayer to choose a "method of accounting" that clearly reflects income. *See* I.R.C. § 446(b). The term "method of accounting" includes "the accounting treatment of any item." Treas.Reg.

our application of the contextual analysis in *Wehrli* arose out of our refusal to apply an arbitrary, formalistic rule in treating repair costs. Instead, we opted for an approach that takes "all the surrounding facts and circumstances" into account. *Wehrli*, 400 F.2d at 690.

■ The cost of moving machinery, like the cost of repairing it, may result in a capital expenditure or a business expense, depending on the context. Plaintiffs emphasize those cases where machinery moving expenses were currently deductible as a business expense. *See, e.g., MacAdam & Foster v. Commissioner*, 8 B.T.A. 967, 1927 WL 426 (1927) (moving paper box manufacturing machinery to another building); *Eastern Shoe Mfg. Co. v. Commissioner*, 8 B.T.A. 1169, 1927 WL 476 (1927) (moving machinery and benches to new quarters); *Fowler & Union Horse Nail Co. v. Commissioner*, 16 B.T.A. 1071, 1929 WL 577 (1929) (moving machinery from two old plants to a new factory); *L.A. Thompson Scenic Ry. Co. v. Commissioner*, 9 B.T.A. 1203, 1928 WL 1387 (1928) (cost of moving salvageable machinery from amusement center); *Addressograph–Multigraph Corp. v. Commissioner*, 4 T.C.M. (CCH) 147 (1945) (cost of moving production equipment from three plants to one plant, even though the move could result in better operating conditions for the business). In none of these cases, however, was it found that the moving expense at issue affected the long-term income-producing capability of the asset moved. Moreover, in none of these cases did the court suggest that machinery moving expenses must be deducted currently regardless of the purpose of the move or its effect on the property's income-producing capacity. Rather, when circumstances dictate that capitalizing moving costs could further the aim of accurate income computation, courts have felt free to do so. In *Wooten v. Commissioner*, 12 T.C. 659, *aff'd*, 181 F.2d 502 (6th Cir.1950), for example, the court found that the cost of moving a radio tower was a capital investment where its purpose and effect was to improve the property's broadcasting capacity. Similar-

ly, in *Winnett v. Helvering*, 68 F.2d 614 (9th Cir.1934), the court held that the costs of moving a boarding house from a lot in a commercial district to a more suitable lot in a residential area was a capital expenditure if the move resulted in a permanent improvement or betterment made to increase the value of the property. These cases show that the tax treatment of business moving expenses depends on the effect the move may have on the income-producing prospects of the assets moved.

Plaintiffs' attempt to pigeonhole certain types of expenses into rigid categories makes little analytical sense in light of the contextual nature of the characterization inquiry. Plaintiffs contend that since many cases capitalizing moving costs involve moving a structure, this treatment is unavailable as a matter of law when some other type of asset is moved. We reject this argument. It defies common sense to assert that property other than structures, such as oil derricks, radio towers, various mineral and resource processing machinery, and refineries, cannot be as much affected by changes in location. Moreover, we have already applied the *Wehrli* analysis to property other than structures. *See Mountain Fuel Supply Co.*, 449 F.2d at 821 (*Wehrli* doctrine applied to reconditioning of gas pipelines). In short, the *Wehrli* analysis focuses on "the purpose, nature, extent, and value of the work done," and not on the type of property affected. 400 F.2d at 690.

■ We conclude that the *Wehrli* "general plan of rehabilitation" analysis is an "overriding precept", affecting the classification of moving as well as repair costs. *Id.* at 689. Whether a particular item, or type of item, is properly included within it is best approached as a question of fact. Accordingly, the district court erred in not allowing the jury to determine whether costs of moving machinery were incurred as part of a general plan of rehabilitation, modernization, and improvement and may therefore be capitalized. We remand this issue to the district court for a new trial in accordance with the views expressed herein.

§ 1.446–1(a)(1). Moreover, Treasury Regulation section 1.446–1(a)(4)(ii) requires proper

classification of expenditures as between capital and expense.

## IV.

## CONCLUSION

To summarize, we reverse the district court and hold that Belle Fourche's surface damage payments to landowners constituted a cost of acquiring the easements, and therefore were ineligible for the investment tax credit contained in I.R.C. § 38. We also hold that the civil penalties assessed Belle Fourche under the Federal Water Pollution Control Act were nondeductible as "fine[s] or similar penalt[ies]" under the exception to deductibility created in I.R.C. § 162(f), and reverse the district court's conclusion to the contrary. We affirm the district court's denial of the Government's motion for directed verdict on the issue of the valuation of the gas processing plant. Finally, we reverse the district court's refusal to instruct the jury that the moving expenses of the gas processing machinery could be part of a " 'general plan' of rehabilitation, modernization, and improvement." We remand this final issue to the district court for a new trial in accordance with the views expressed herein.