T.C. Memo. 1996-539


UNITED STATES TAX COURT


S. CLARK JENKINS AND MARY P. JENKINS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20718-94.          Filed December 12, 1996.


<u>Randolph G. Abood</u>, for petitioners.

<u>Mary Ann Amodeo</u> and <u>Louis A. Ramunno</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CLAPP, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' Federal income taxes as follows:

| Year | Deficiency |
| --- | --- |
| 1990 | $3,100 |
| 1991 | 9,329 |

After concessions by the parties, the issues for decision are:

(1) Whether payments made to North Carolina and Virginia resulting from deficiencies in fertilizer products are deductible ordinary and necessary business expenditures under section 162(a) or nondeductible fines or penalties under section 162(f).  We hold that the payments are deductible ordinary and necessary business expenditures under section 162(a).

(2)  Whether petitioners have substantiated amounts greater than the amounts conceded by respondent.  We hold that they have not.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found.  We incorporate by reference the stipulation of facts and the attached exhibits.

Petitioners were residents of Tarboro, North Carolina, when the petition was filed.  S. Clark Jenkins (petitioner) owned 50 percent of W.S. Clark & Sons, Inc. (WSC), an S corporation.  The dispute in this case stems from amounts paid by WSC to North Carolina and Virginia resulting from deficiencies in fertilizer products and deducted as ordinary and necessary business

expenditures. The tax consequences passed through to petitioner as a shareholder of WSC.

WSC is engaged in the business of producing and supplying fertilizers, agricultural chemicals, seeds, and other agricultural products for use by farmers. WSC distributes its products to retail farm centers, wholesale distribution centers, and independent commission agents. The dispute in this case relates to WSC's fertilizer operations.

During the years at issue, WSC owned and operated fertilizer production facilities in North Carolina and Virginia. It conducted most of its business in North Carolina. WSC distributes most of its fertilizer in bulk; i.e., by the truckload.

Fertilizer primarily consists of three active ingredients: Nitrogen, phosphate, and potash. Fertilizer also contains smaller amounts of other nutrients known as micronutrients, as well as inactive ingredients. Farmers or other purchasers select the concentration of the three fertilizer ingredients depending on their particular needs. Soil conditions, the type of crop being planted, the expected weather conditions, and price may each influence the farmer's selection of fertilizer. For example, a corn farmer may require fertilizer in the mixture of 5-15-30 (which is 5 percent nitrogen, 15 percent phosphate, and 30 percent potash); a soybean farmer may require fertilizer in the mixture of 3-9-27.

WSC manufactures fertilizer using two methods:  A blending method and an ammoniation method.  In the blending method, the separate ingredients of fertilizer are purchased from large mining companies and nitrogen producers.  The fertilizer ingredients are poured in bulk form into a steel receptacle and then blended through a circular mixing motion.  The farmer's specifications determine the concentration of each fertilizer ingredient in a particular blend.

In the ammoniation method, the fertilizer ingredients are mixed through a heat reaction involving ammonia, superphosphate, and sulphuric and/or phosphoric acid.  The solution is heated to a semiliquid.  As the solution is slowly cooled, the final product forms as a pellet.  The pellets are removed from the solution, dried, and packaged.

A fertilizer is deficient when it contains less of a particular ingredient than guaranteed by the manufacturer. Fertilizer companies expect that some of their fertilizer will be deficient in at least one category of the three primary ingredients.  Segregation, the most common source of deficiencies, affects both types of fertilizer manufacture.

Segregation develops from particle-size differences among the fertilizer ingredients.  The particle-size differences cause the particles not to mix properly, and segregation results.  The entire batch of fertilizer may have the proper percentages of the three active ingredients, but a test sample taken from the batch

may vary due to segregation.  Density differences among the respective particles do not exacerbate segregation; particle size is the determinative factor.  For this reason, a fertilizer manufacturer will attempt to purchase and then blend ingredients that have a similar particle size.

Segregation can be reduced but not eliminated.  One method used to reduce segregation is purchasing the separate fertilizer ingredients on the basis of size guide number (SGN).  SGN is a method of measuring the average size of the particles of the particular fertilizer ingredient being purchased.  The same SGN for each of the three primary fertilizer ingredients does not assure a uniform particle size in each of the three primary ingredients, since actual sizes among the three average sizes may be significantly different.

The North Carolina and Virginia legislatures have enacted legislation to regulate commercial fertilizer manufacturers operating in their States.  The North Carolina Commercial Fertilizer Law of 1977, N.C. Gen. Stat. secs. 106-655 through 106-677, as amended through 1993, is substantially the same as the law in effect in North Carolina during the taxable years in issue.  N.C. Gen. Stat. sec. 106-656 provides that its purpose "shall be to assure the manufacturer, distributor, and consumer of the correct quality and quantity of all commercial fertilizer sold in this State".  The Virginia Commercial Fertilizer Law, Va.

Code Ann. sec. 3.1 (Michie 1994), is substantially the same as the North Carolina fertilizer law for purposes of this case.

In 1990 and 1991, WSC paid $43,809 and $44,876, respectively, to the North Carolina Department of Agriculture pursuant to the assessment of penalties for violation of N.C. Gen. Stat. sec. 106-665. In 1991, WSC paid $2,057 to the Virginia Department of Agriculture pursuant to the assessment of penalties for violation of an analogous provision of the Virginia fertilizer law.

The relevant portions of N.C. Gen. Stat. sec. 106-665 may be summarized as follows:

(a) When making an administrative determination as to whether a fertilizer is deficient in plant food, the commissioner of agriculture (commissioner) shall be guided solely by the official sample taken by an authorized agent and in the manner prescribed by statute;

(b) if the analysis shows that any commercial fertilizer falls short of the guaranteed nitrogen, phosphate, or potash, then a penalty of three times the value of the deficiency shall be assessed if the deficiency exceeds the investigational allowance; and

(c) all penalties assessed under N.C. Gen. Stat. sec. 106-665 shall be paid to the consumer of the lot of fertilizer; if the consumer cannot be found, the amount of the penalty assessed shall be paid to the commissioner, who shall deposit the same

with the State treasurer as custodian for the department of agriculture fund. The sums that have been deposited with the State treasurer payable to the consumer shall not be subject to claim by the consumer after 12 months from the date of assessment.

The "investigational allowance" allows for variations in fertilizer sampling, handling, and laboratory analysis. If a deficiency exceeds the investigational allowance, then the penalty is assessed on the entire deficiency.

The intent of the statute is to reimburse the consumer for the cost of the deficient fertilizer ingredient, which the farmer paid for but never received, and the lower crop production that results from the deficiency in the fertilizer.

Thus, under N.C. Gen. Stat. sec. 106-665, if a fertilizer is deficient in one or more fertilizer ingredients from the amount requested by, and guaranteed to, the customer/farmer, then a penalty is imposed on the manufacturer. The penalty under N.C. Gen. Stat. sec. 106-665 is calculated on the amount and relative value of the deficient product. For example, for 25 tons (2,000 pounds per ton) of 10-10-10 fertilizer (10 percent nitrogen, 10 percent potash, and 10 percent phosphate) which contains only 8 percent nitrogen, the penalty is calculated as follows: the fertilizer is guaranteed to contain 200 pounds of nitrogen per ton (i.e., 2,000 pounds x 10 percent), but it contains only 160 pounds of nitrogen (i.e., 2,000 pounds x 8 percent). As a

result, there is a deficiency of 40 pounds per ton (200 pounds minus 160 pounds).  Assuming the relative value of nitrogen is 28 cents per pound, the penalty will equal 40 pounds x 28 cents x 3 = $33.60 per ton x 25 tons = $840.  The fertilizer commissioner determines and publishes annually the values per pound of each of the primary ingredients of fertilizer.

Fertilizer inspectors from the departments of agriculture of North Carolina and Virginia typically visit a fertilizer manufacturer unannounced to obtain samples of fertilizer for testing.  Once on the site, they randomly collect official samples of fertilizer.  The inspectors collect samples of the end product only; i.e., the mixed fertilizer; they do not take samples of the separate ingredients of the mixed fertilizer.  The inspectors place the samples in containers that are marked and registered, and they maintain a chain of evidence with all official samples.  The official samples are taken to a testing facility, where they are tested for conformity with the percentages guaranteed by the fertilizer manufacturer.  The testing facility reports the test results to the fertilizer administrator, and copies of the results are sent to the fertilizer manufacturer.  The fertilizer manufacturer is allowed 2 weeks to comment on the test results.  If a deficiency exists that gives rise to a penalty, then an assessment letter is mailed to the manufacturer at the end of 2 weeks.  The assessment letter contains the amount of the penalty imposed for a violation.  If

the ultimate consumer of the deficient fertilizer can be identified, the penalty is paid to the consumer.

If the ultimate consumer cannot be identified, the penalties are paid to the State department of agriculture. Often the ultimate consumer cannot be identified because most fertilizer samples are taken from dealer storage, and the dealers do not record who purchased a particular batch of stored fertilizer. Thus, most penalties are paid to the State department of agriculture.

The departments of agriculture in North Carolina and Virginia test approximately 10 percent of the fertilizer sold by each fertilizer manufacturer. However, if a fertilizer manufacturer is consistently below standard, the department of agriculture will test a greater percentage of that manufacturer's fertilizer.

OPINION

Section 162(a) provides that taxpayers may deduct all ordinary and necessary trade or business expenses. Subject to section 162(f), respondent concedes that the payments at issue meet the requirements of section 162(a) as deductible business expenses. The payments were normal, usual, and customary, and they stem from an activity ordinarily to be expected from WSC and other fertilizer manufacturers. Commissioner v. Heininger, 320 U.S. 467, 471 (1943); Deputy v. Dupont, 308 U.S. 488, 495 (1940). The payments were appropriate and helpful also for the

development of WSC's business.  Commissioner v. Tellier, 383 U.S. 687, 689 (1966).

The real dispute in this case centers on section 162(f), which provides that no deduction shall be allowed under section 162(a) for any "fine or similar penalty paid to a government for the violation of any law."  The regulations provide that, for purposes of section 162(f), a "fine or similar penalty" includes an amount paid as a civil penalty imposed by a Federal, State, or local law.  Sec. 1.162-21(b)(1)(ii), Income Tax Regs.

Section 162(f) disallows deduction of civil penalties "'imposed for purposes of enforcing the law and as punishment for the violation thereof'", and yet some payments, although labeled "penalties", remain deductible if "'imposed to encourage prompt compliance with a requirement of the law, or as a remedial measure to compensate another party'".  Huff v. Commissioner, 80 T.C. 804, 824 (1983) (quoting Southern Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 652 (1980)).  Where the law serves both a remedial and a punitive purpose, then we must determine which purpose the payments in question were designed to serve. S & B Restaurant, Inc. v. Commissioner, 73 T.C. 1226, 1232 (1980).

The proper inquiry is the purpose which the statutory penalty is to serve, as opposed to the type of conduct which gives rise to the violation resulting in the penalty.  Southern Pac. Transp. Co. v. Commissioner, supra at 653.

The characterization of a payment for purposes of section 162(f) depends on the origin of the liability giving rise to it. Bailey v. Commissioner, 756 F.2d 44, 47 (6th Cir. 1985); Middle Atl. Distribs. v. Commissioner, 72 T.C. 1136, 1144-1145 (1979).

Each party provided an expert witness to assist the Court in understanding the workings of the North Carolina Department of Agriculture and the administration of the North Carolina commercial fertilizer law.

Petitioner's expert witness, James R. Stevens (Stevens), developed his expertise during his 41 years of service with the North Carolina Department of Agriculture. He began his career in 1950 as a temporary fertilizer inspector. He was promoted to chief fertilizer inspector in 1955 and promoted to feed, fertilizer, and pesticide inspector supervisor in 1965. In 1974, Stevens was promoted to fertilizer administrator, and he remained in that position until his retirement in December 1991. Stevens currently works as a consultant to the fertilizer industry.

Respondent's expert witness, Peter T. Hight (Hight), received a bachelor of science degree in horticulture in 1979 and a master's degree in crop science in 1986, both from North Carolina State University. Hight has worked in an agriculture-related field since 1980. From March 1980 through 1987, Hight served as an agriculture extension agent, conducting numerous field investigations on plant disease and plant nutritional and insect problems. From January 1988 through October 1991, Hight

served as an agronomist for the North Carolina Department of Agriculture.  In November 1991, Hight succeeded Stevens as fertilizer administrator for the North Carolina Department of Agriculture, a position he held until October 1994.

Both experts were credible and helpful witnesses.  They gave parallel testimony regarding the fertilizer industry and administration of the fertilizer laws.  They agreed in nearly every material aspect of this case except the legislative purpose for the penalty payments at issue.

Both experts agreed that segregation is the primary factor leading to deficient fertilizer, and they also agreed that deficiencies can be reduced but not eliminated.  The experts agreed that there are two losses to a farmer when the farmer purchases a deficient fertilizer that is applied to the farmer's crop.  The first loss to the farmer is the cost of the deficient fertilizer ingredient, which the farmer paid for but never received.  The second loss is the farmer's reduced yield at harvest caused by the deficient fertilizer.  They agreed that the second loss, reduced yield at harvest, is nearly impossible to measure, since crop yield is dependent on numerous factors.

The experts' opinions diverge when it comes to the purpose of the penalty payments at issue.  Stevens opined that the purpose of the penalty for deficient fertilizers is to compensate the user for any loss the deficient fertilizer has caused.  Hight opined that the purpose of the penalty for deficient fertilizers

is to punish and deter fertilizer manufacturers who fail to comply with the fertilizer laws.

We are not bound by the opinion of an expert witness. We will accept or reject expert testimony when, based on the record, it is appropriate to do so. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). We may choose to accept the opinion of one expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion of that opinion; Seagate Technology, Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).

We are satisfied that the payments at issue were designed to compensate the consumer of the deficient fertilizer. The North Carolina fertilizer law provides: "All penalties assessed under this section shall be paid to the consumer of the lot of fertilizer represented by the sample". N.C. Gen. Stat. sec. 106-665(c). The Virginia fertilizer law provides: "If the analysis shows that the fertilizer is deficient * * * then an assessment * * * shall be paid to the consumer by the guarantor." Va. Code Ann. sec. 3.1-106.13.A (Michie 1994). The quoted language indicates that the respective State legislatures intended to compensate the consumer of the deficient fertilizer.

The two-step method used to calculate the penalty also supports the conclusion that the payment to the consumer is remedial. Each step of the calculation accounts for a separate loss to the consumer. First, the value of the deficient

fertilizer ingredient is calculated. This calculation accounts for the amount of fertilizer ingredient paid for but never received by the consumer. Second, the value of the deficient fertilizer ingredient is multiplied by a factor of 3 (2 in Virginia). We conclude that the legislatures intended this calculation to account for the reduced crop yield to the consumer, despite the fact that reduced crop yield may be difficult, if not impossible, to measure. In so doing, the respective legislatures were attempting to compensate for the consumer's actual loss. See Middle Atl. Distribs. v. Commissioner, 72 T.C. at 1145.

Respondent argues that the payments at issue had no, or a negligible, compensatory element because the vast majority of the payments were made to the respective States and not the consumer. We do not find respondent's argument persuasive. The inability of the departments of agriculture to identify the consumer of the deficient fertilizer and the difficulty in effectuating the legislation does not alter the legislative intent.

Respondent relies on specific provisions of the fertilizer law to argue that the payments in question were designed to enforce the law and to punish its violation. Respondent cites the North Carolina legislature's statement that "it is in the public interest that the State regulate activities" of commercial fertilizer companies. N.C. Gen. Stat. sec. 106-672 (1993). Respondent also highlights the commissioner of agriculture's

authority under various <u>other</u> sections of the fertilizer law in an attempt to show a law enforcement purpose. However, the payments at issue in this case stem from N.C. Gen. Stat. sec. 106-665 and Va. Code Ann. Sec. 3.1-106.13 (Michie 1994). We need not, and do not, decide the purposes of any other sections of the fertilizer laws.

Respondent argues that the legislature contemplated that a separate civil action for damages would be the compensatory remedy for the consumers of deleterious fertilizers. Respondent reasons that since this compensatory remedy exists, the payments at issue are not designed to compensate the consumer of the deficient fertilizer. We do not agree. N.C. Gen. Stat. sec. 106-665 applies to the sales of large and small quantities of fertilizer. The experts in this case testified that the reduced crop yield from a deficient fertilizer is difficult to establish. We consider it likely that this difficulty also would hamper a plaintiff's ability to prove damages in a civil case. Thus, we do not agree that a civil action for damages is "the primary compensatory or remedial mechanism" in the fertilizer law. See <u>True v. United States</u>, 894 F.2d 1197, 1205-1206 (10th Cir. 1990) (stating that provision in the Federal Water Pollution Control Act authorizing Government to recoup oil cleanup costs was primary compensatory mechanism). If the legislature considered a civil action for damages to be the primary compensatory remedy, then we would see no purpose for the legislative edict that the

payments pursuant to N.C. Gen. Stat. sec. 166-665 be made to the consumer. The legislature likely anticipated that the payments pursuant to N.C. Gen. Stat. sec. 166-665 would provide the consumer a modicum of relief in circumstances where the amounts involved would not justify the cost of a civil action for damages.

Respondent attempted to discredit Stevens using the fertilizer inspectors manual (inspectors manual) published by the Association of American Plant Food Control Officials (AAPFCO). North Carolina and Virginia are members of AAPFCO. Stevens edited the inspectors manual, and he authored a large portion of it. The inspectors manual instructs inspectors to treat the official fertilizer samples as evidence in a crime. Respondent seems to argue that since the inspectors are told to treat the fertilizer samples as evidence in a crime, then the fertilizer inspectors must be investigating a crime. Respondent reasons that the payments at issue are punishment for a criminal act. Respondent overlooks the several categories of conduct dealt with in the fertilizer laws. Some acts are punishable as misdemeanors. See N.C. Gen. Stat. sec. 106-668. Thus, instructing the fertilizer inspectors to treat every sample as evidence in a crime seems logical since, at the time the sample is taken, the inspector is unaware of which, if any, provision of the fertilizer law has been violated.

Petitioners have offered no evidence to support their argument that WSC paid amounts greater than those conceded by respondent.  We will not guess as to any additional amount that WSC could have deducted.  See <u>Lerch v. Commissioner</u>, 877 F.2d 624, 628 (7th Cir. 1989), affg. T.C. Memo. 1987-295.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>